IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

June 9, 2009 Session

## STATE OF TENNESSEE v. PERRY AVRAM MARCH

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2005-D-2854     Steve Dozier, Judge**

---

**No. M2007-00701-CCA-R3-CD - Filed June 2, 2010**

---

A jury found the defendant, Perry Avram March, guilty of one count of conspiracy to commit first degree murder and two counts of solicitation to commit first degree murder. The trial court merged the solicitation counts into the conspiracy count and entered a judgment for conspiracy to commit first degree murder. The court sentenced the defendant to twenty-four years in the Tennessee Department of Correction. On appeal, the defendant presents the following issues for review: (1) whether a fatal variance existed between the evidence presented at trial and the allegations in count one of the indictment; (2) whether solicitation to commit first degree murder is protected speech under the First Amendment; (3) whether the trial court erred in denying the defendant's motion for a mistrial; (4) whether the trial court erred in admitting evidence of the defendant's discussions about express kidnappings in Mexico; (5) whether the trial court committed plain error by failing to instruct the jury concerning the *mens rea* for the discrete elements of conspiracy to commit a homicide; (6) whether the trial court's instruction of criminal responsibility permitted the jury to impute the conduct of another to the defendant; (7) whether the trial court erroneously denied the defendant's request to instruct the jury that they could not convict the defendant of more than one offense; (8) whether the defendant's sentence is excessive; and (9) whether the Sixth Amendment requires that the facts necessary to impose consecutive sentences be found by the jury or admitted by the defendant, and (10) whether the cumulative effect of the errors during the defendant's trial violated his due process guarantees. After a thorough review of the record, the parties' briefs, and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court, Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

William D. Massey and Lorna S. McClusky, Memphis, Tennessee, and John E. Herbison, Nashville, Tennessee, for the appellant, Perry Avram March.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Victor S. Johnson III, District Attorney General; Thomas B. Thurman, Deputy District Attorney General; and Katrin Novak Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Background**

The Davidson County Grand Jury indicted the defendant, Perry Avram March, on one count of conspiracy to commit first degree murder and two counts of solicitation to commit first degree murder. The defendant was tried before a Davidson County jury, and the parties presented the following evidence.

Carolyn Levine testified that she had been the wife of Lawrence Levine for forty-five years. They had two children, Mark Levine and Janet March. Mrs. Levine was the grandmother of Sammy and Tzipi March, the children of Janet March and the defendant. Mrs. Levine stated that she first met the defendant in the early 1980s at the University of Michigan, where he and Janet were students. After they graduated, Janet and the defendant married in 1987. Mrs. Levine testified that she and her husband provided financial support to Mrs. March and the defendant, including paying his law school tuition, giving them a house, helping in the finance of a new home, and a yearly $10,000 gift to each of them. Mrs. Levine further testified that she and her husband had financially assisted the defendant's father, Colonel Arthur March[1]. She stated that they purchased his home, which was in foreclosure, and allowed him to continue to live in it. After he moved to Nashville, they also allowed Colonel March to stay in their home until he could find an apartment. Mrs. Levine said that Colonel March moved from Nashville to Ajijic, Mexico in 1993.

Mrs. Levine testified that on August 15, 1996, Mrs. March "suddenly disappeared, and [they] never heard from her again." According to Mrs. Levine, Mrs. March and the defendant "were having severe marital problems, and Janet had planned to see a divorce attorney" the day before her disappearance. No one has found Mrs. March's body. Mrs. Levine said that the defendant and his children went to Chicago after Mrs. March's disappearance. Eventually the defendant moved to Mexico and remarried.

---

[1] Throughout this opinion, we will refer to Janet March as "Mrs. March," Perry March as "the defendant," and Arthur March as "Colonel March."

Mrs. Levine said that before Mrs. March's disappearance, she "cared about [the defendant] a lot" and "treated him like [her] own son." Their relationship "deteriorated" after Mrs. March's disappearance. After the defendant went to Chicago, the Levines filed for grandparents' visitation in Illinois because the defendant did not allow them to see their grandchildren. The defendant and the Levines were involved in litigation concerning visitation rights, custody of the children, Mrs. March's estate, and Mrs. March's disappearance. Mrs. Levine testified that the court granted her and her husband temporary custody of their grandchildren in August 2005.

Mrs. Levine recalled when authorities arrested the defendant for Mrs. March's murder and stated that she was listed as a witness on the indictment. She also stated that she assisted authorities during the conspiracy investigation. According to Mrs. Levine, the authorities told the Levines "not to answer the phone because someone may be checking to see if [they] were alive."

On cross-examination, Mrs. Levine testified that she and her husband had been living in Nashville, TN since 1961. Her husband was a successful attorney who had been practicing in Nashville since they moved there. She said that the home that Mrs. March and the defendant built after they were married was in Mrs. March's name only. Mrs. Levine testified that at the time of Mrs. March's disappearance, she and the defendant would visit each other's homes, and she and her husband would spend time with their grandchildren. She said that it was "about two weeks" before her husband and the defendant reported Mrs. March missing.

Vickie Renee Farris testified that Russell Nathaniel Farris is her oldest child. Mr. Farris was an inmate at the Criminal Justice Center in Davidson County. She stated that when she visited him in September 2005, she became concerned about something he told her and called Lawrence Levine. She stated that she did not know Mr. Levine, but she "was concerned that . . . something could happen . . . ." Ms. Farris "felt like . . . someone needed to go see her son." She stated that she called Mr. Levine instead of the police because she "didn't trust the police." She further stated that she called Mr. Levine on her own, and no one instructed her to call him.

Lawrence Levine testified that he was married to Carolyn Levine. He identified the defendant and stated that the defendant and his daughter were married. He further stated that they got married while the defendant was attending Vanderbilt Law School, and he and his wife "paid for his room, board, tuition and books" while he was there. Mr. Levine said that the defendant worked at his law firm from 1991 to 1996, and the defendant was working at his law firm when Mrs. March disappeared. Mr. Levine and his wife were both witnesses against the defendant in his second-degree murder case.

Mr. Levine stated that he reviewed transcripts of recorded conversations between the defendant and Nathaniel Farris. He further stated that the information contained in the transcripts concerning where he and his family lived and the location of his office was accurate. Mr. Levine said that the transcripts also contained information about their temporary residence. According to Mr. Levine, he "received a phone call from a woman, who at first was reluctant to identify herself to [him]." He said that "she explained that she had some information about Perry March in jail and that she was afraid to go to the police, because she didn't trust the police." Mr. Levine could not recall whether she gave her son's name because he received many phone calls concerning his daughter after her disappearance. Mr. Levine said that he called the district attorney's office and told them that the woman had "important information about Perry March." The district attorney's office did not immediately inform him about the content of the information, and he did not find out about the plot to kill him and his wife until weeks later. After he received the information, Mr. Levine said that they "took precautions, [be]cause [they] were scared. This was not the first time Perry and Arthur March had attempted to kill [them]; so, [they] were scared."

Defense counsel contemporaneously objected to Mr. Levine's testimony regarding the defendant and Colonel March's previous attempts to kill the Levines and asked for a curative instruction. In a bench conference that followed, defense counsel moved for a mistrial. The court denied the defendant's motion for a mistrial, sustained the objection, and instructed the jury to disregard Mr. Levine's statements. At the end of the bench conference, the examination of Mr. Levine resumed.

On cross-examination, Mr. Levine stated that he and his wife helped the defendant, the defendant's sister, and Colonel March financially because "[Mrs. March] loved [the defendant] and she wanted to do everything she could to help [the defendant] and his family. Mr. Levine agreed that the phone book listed his home and work addresses, and anyone could get them. He testified that after Mrs. March's disappearance, the defendant stayed at his home in Nashville before moving to Chicago. Mr. Levine denied telling the defendant not to return to the home.

Mr. Levine said he had sued the defendant to gain custody of his grandchildren. Mr. Levine testified that the children lived in Mexico during 2000, and he went to Mexico to get the children from Mexico pursuant to a court order.

The prosecutor interrupted Mr. Levine's testimony for a bench conference and warned that if defense counsel continued to question Mr. Levine about when he went to Mexico and got the children for a visit, then Mr. Levine would "say that Arthur March had a gun and threatened them and chased them and all that stuff." Defense counsel expressed concern

regarding Mr. Levine's unresponsiveness to his questions. After the bench conference, the judge instructed Mr. Levine not to bring out further information that he thought was relevant and that "if the [s]tate is of the opinion that they need to solicit from [him] further relevant information" then they will do so during direct testimony. Defense counsel resumed cross-examination of Mr. Levine.

Mr. Levine stated that "a Mexican court, a Mexican judge, an American and an Illinois judge, and a court order" gave him permission to get the children from Mexico. Mr. Levine further stated that the order authorized visitation for thirty-nine days. He said that he "went to Mexico. The children were turned over to [them] by a Mexican judge and the Mexican police; and, when that happened, [he] saw the children." Eventually a federal court ruled that Mexico had jurisdiction to decide child custody and ordered that the Levines return the children to Mexico.

When asked whether the relationship between his family and the defendant was strained at the time the federal court ordered that they must return the children to Mexico, Mr. Levine responded "Yes. It was . . . that trip to Mexico, when [the defendant] and his father attempted . . . to kill us." The court attempted to interrupt Mr. Levine and prevent him from testifying that the defendant and Colonel March attempted to kill him. The judge again advised Mr. Levine to "[j]ust answer the questions." Defense counsel renewed their earlier motion for a mistrial. The judge denied the renewed motion and the cross-examination resumed.

Mr. Levine testified that the children resided in Mexico with the defendant until authorities charged the defendant with the homicide of Mrs. March in 2005. He denied doing everything that he could to hurt the defendant after Mrs. March's disappearance and denied attempting to take his law license. In addition, Mr. Levine denied personally filing a complaint against the defendant with the Board of Professional Responsibility, but he admitted that his firm may have filed a complaint. Mr. Levine recalled suing the defendant for custody of the children, Mrs. March's wrongful death, and taking property from Mrs. March's estate. He also stated that besides these lawsuits, he also filed two lawsuits for visitation with the children. Mr. Levine denied filing an additional lawsuit against the defendant and claimed that his firm and "other organizations and people" filed a complaint against the defendant.

Mr. Levine testified, on redirect examination, that the phone book did not list his grandchildren's school or the address and telephone number of his temporary apartment. Mr. Levine said that he knew that the defendant was disbarred, and that his license was revoked for theft. He recalled that the defendant initiated five lawsuits against him and his wife.

According to Mr. Levine, the defendant was not successful in any of the lawsuits involving money.

Justin Johnson, a Tennessee criminal defense and personal injury lawyer, testified that he represented Russell Nathaniel Farris. He stated that Mr. Farris had been incarcerated since he began representing him for attempted first degree murder and two aggravated robbery charges. Mr. Johnson stated that on October 3, 2005, he received a call from Assistant District Attorney General Tom Thurman. Mr. Johnson stated that he had met with Mr. Farris and discussed the present case before General Thurman called, and he "instantly knew exactly what [General Thurman] was talking about" when he called. After General Thurman's phone call, Mr. Johnson met with his client again. At this meeting, they discussed "the scenarios of what could go on" and "talked about almost every possibility [they] could think of . . . ." Mr. Farris had several pending charges against him, and they were concerned about him being charged with conspiracy. Mr. Johnson explained the withdrawal defense to Mr. Farris and because of this discussion, Mr. Farris agreed to talk with the state. Mr. Johnson called General Thurman and arranged a meeting. They met on October 4, 2005 and determined that Mr. Farris would use a tape recorder in his cell to record his conversations with the defendant. According to Mr. Johnson, "[t]here was never any promise of any help . . . nor did [they] ask for any." Mr. Johnson testified that the court reduced Mr. Farris's bond "so it would look like . . . he would be able to make the bond." Mr. Farris was unable to make the bond, and authorities transferred him to the Williamson County Jail.

During cross-examination, Mr. Johnson denied knowledge of Mr. Farris's assistance to police before he began representing him. Mr. Johnson agreed that if a jury convicted him of his pending attempted first degree murder and aggravated robbery charges, Mr. Farris could serve a minimum fifteen-year sentence and a maximum one hundred eighty-year sentence. Mr. Farris also faced a possible eight to thirty-year sentence for a pending aggravated robbery charge. Mr. Johnson stated that, since he began representing him, Mr. Farris had always been in state custody. Mr. Johnson agreed that for Mr. Farris to "get his freedom," he would have to "cut a deal," a jury would have to find him not guilty of his pending charges, or the court would have to sentence him to probation.

To decide whether Mr. Farris could testify about discussions he had with the defendant concerning express kidnappings, the prosecution made an offer of proof outside the presence of the jury. After hearing Mr. Farris's testimony, the court ruled that the discussions between Mr. Farris and the defendant concerning express kidnappings were admissible.

On direct examination, Mr. Farris testified that he was an inmate at the Corrections Corporation of America facility in Nashville, Tennessee after being arrested for several crimes. He stated that authorities moved him to protective custody in the Criminal Justice Center because of enemies he acquired after working with the police department's vice squad. Mr. Farris first met the defendant when the defendant arrived at the Criminal Justice Center. During the defendant's first night in jail, Mr. Farris called the defendant's brother-in-law in Chicago at the defendant's request. Mr. Farris did not have any further contact with the defendant until a couple of weeks later.

According to Mr. Farris, the defendant initiated a conversation with him and asked about prison life. Mr. Farris told the defendant about prison, and the defendant told him about Mexico. Mr. Farris stated that eventually the defendant "started telling [him] about express kidnappings in Mexico." Mr. Farris said that he did not have previous knowledge of what express kidnappings were, and the defendant explained that express kidnappings were when "you grab somebody's child, . . . that has a lotta [sic] money and hold them for ransom." Mr. Farris said that they discussed express kidnappings at least ten times.

Beyond express kidnappings, Mr. Farris said that he and the defendant discussed killing the Levines. Mr. Farris stated that killing the Levines came up after the defendant was "stressing the issue that, if it weren't for the Levines, that he wouldn't be locked up, that they wouldn't have a case against him in court, and . . . the Levines [were] his biggest problem, as far as his case went." Mr. Farris further stated that the defendant thought he was in jail for first degree murder, and it was the defendant's idea to kill the Levines. Mr. Farris testified that he and the defendant discussed killing the Levines for about a month before he spoke to the police. Mr. Farris and the defendant communicated by going to each other's cell doors to talk. They could also talk while they were in their cells, which were next to each other. During the time that Mr. Farris had a cell mate, he and the defendant would go to the roof to talk about the plan to kill the Levines. According to Mr. Farris, he and the defendant talked every day. They also used written notes to communicate. Mr. Farris stated that the defendant also spoke with the inmate on the other side of his cell, and occasionally this other inmate was on the roof while he and the defendant talked. Mr. Farris further stated that if the defendant was not talking to him, he was talking to the other inmate.

Mr. Farris said that he went along with the plan to kill the Levines because the defendant said he would pay his bond. According to Mr. Farris, the defendant said that he could use "a lady in New York" and some property he had in Mexico to get the money to pay the bond. Mr. Farris created a fictitious girlfriend, Danielle, as part of the plan to get the defendant to make his bond. The defendant wrote letters to Danielle that Mr. Farris "was to copy and mail to . . . the girl [he] made up."

Mr. Farris testified that he and the defendant talked about killing the Levines "for about a month" and that he never intended to kill the Levines. Eventually Mr. Farris became concerned about his involvement and told his mother and attorney about the discussions that he was having with the defendant. Mr. Farris was concerned about being charged with the crime and what would happen if he did not follow the plan after the defendant posted his bond. After Mr. Farris talked with his mother and attorney, he met with the police and the district attorney. Mr. Farris said that the district attorney did not promise him anything for giving his statement to authorities. He further said that "it'd be nice" to get consideration for testifying truthfully at the trial; however, he did not know whether it would happen. Before speaking with authorities on October 4, no one had discussed the defendant with Mr. Farris.

After meeting with authorities, Mr. Farris agreed to record his conversations with the defendant. Mr. Farris stated that authorities instructed him to "go along with what was supposed to happen," so he acted like a hit man. At the time Mr. Farris spoke with authorities, the plan was for him to get out of jail on bond, lay low for a while, observe the Levines, and find a routine where he could catch them together. According to Mr. Farris,

[he] was to kill them - - [He] was to make contact with [Colonel March] . . . to get a feel about . . . how he was gonna [sic] act about things.

[A]fter [he] killed the Levines, [the defendant] wanted [him] to . . . have some chilling-off time . . . [he] didn't want [him] to go to Mexico right then . . . . [A] month or so after, [he] was to go to Mexico and wait on [the defendant].

Mr. Farris further testified that Colonel March was to provide him with a place to stay in Mexico and "show [him] the ropes about being in Mexico, until [the defendant] got there." Mr. Farris stated that the defendant gave him email addresses and a phone number to contact Colonel March.

Per the instructions given to him by the police, Mr. Farris told the defendant that his bond was lowered and that his girlfriend would be posting it. Authorities placed recorders in Mr. Farris's cell, and he recorded a conversation with the defendant on October 6. After the first recording, someone from Internal Affairs at the prison went to Mr. Farris's cell to retrieve the recorder and give him a new one. Mr. Farris recorded additional conversations between him and the defendant on October 7.

After he made the second recording, authorities transferred Mr. Farris to the Williamson County Jail so that it would appear that he was out on bond. While he was there, Mr. Farris further cooperated with police by calling Colonel March. The police gave him a

script to follow, and he recorded five conversations with Colonel March over several weeks. Mr. Farris stated that during the last conversation he told Colonel March that he had "done the job and to pick him up at the Guadalajara Airport."

On cross-examination, Mr. Farris admitted that he had been convicted of theft of property more than $1000, theft of property more than $500, facilitation of robbery, reckless endangerment, theft of property more than $10,000, and facilitation of aggravated robbery. He further admitted that he had three counts of criminal attempt to commit first degree murder and two counts of aggravated robbery charges pending against him. Mr. Farris agreed that he worked as a confidential informant for the police in February 2005.

Mr. Farris recalled the day that the defendant arrived in the cell next to him, which was the only available cell. He testified that he told the defendant that he hated prison and that he did not want to go back to prison. Mr. Farris was facing several years of incarceration if convicted of his pending charges, and he said that was why he hired an attorney. Mr. Farris denied knowing that if he gave information about another person he could receive leniency on his pending charges. He testified that he was expecting leniency after working for the police in 2005, but he did not receive anything for his work. Mr. Farris agreed that this was why he did not trust the police.

Mr. Farris testified that after the defendant arrived at the jail he watched the news and heard about the defendant's case. Mr. Farris denied that creating a crime and bringing the defendant into it was his "ticket to freedom." He agreed that if he got favorable treatment by becoming a state witness, he would be released from jail more quickly and would not have to risk a jury trial. However, Mr. Farris further stated that he did not know if that would happen because he had "never gotten no [sic] deal." He testified that during a conversation with the defendant, he told the defendant that their plan was his only chance for freedom and that he did not plan to get caught. Mr. Farris said that he "was playing a role" when he said this. Mr. Farris also said that he was helping the police for free, and he still did not trust them while he was working for them. Mr. Farris admitted that he said things to make the defendant believe he wanted to kill the Levines, but he denied that he pushed the defendant toward killing them. According to Mr. Farris, the defendant "was just as hyped as [he] was."

Mr. Farris stated that he had been talking to the prosecutor and detectives about this case, and the prosecutor asked him to testify truthfully at the trial. He stated that he "was gonna [sic] do the footwork," and the defendant was going "to set everything up." Mr. Farris told the defendant that he had previously committed a crime like their plan. Mr. Farris denied that he "petted" the defendant into conspiring to kill the Levines. However, Mr. Farris admitted that he told the defendant that he never had a big brother, he never felt real compassion for anyone outside his family, and talking to the defendant put him at ease. He

also told the defendant that before he met him he was mad at everyone. He further admitted that he told the defendant that he would kill himself before he let anything go wrong with their plan. Mr. Farris testified that he talked about the defendant's family to try to get close to the defendant. He denied trying to inflame the defendant into killing the Levines and stated that the defendant was already angry with them and "hated them." Mr. Farris said that he "was trying to show [the defendant] . . . that [he] agreed with him, that [he] was on his side, that [he] felt the same way he did about the Levines, which [he did not]." He further stated that he was not going to kill the Levines, and he agreed that he could not have killed them because he was in jail.

Mr. Farris admitted that he told the defendant that they needed to talk about "hard facts" and "get a plan down pat" before he was released on bond. When asked if his statements showed that he and the defendant did not have a plan in place, Mr. Farris answered that one "could probably draw that from it." Mr. Farris testified that he told the defendant that he had money to buy two cars to use during the plan to kill the Levines, but he did not really intend to buy them. Mr. Farris admitted that during the recordings, he concocted multiple ideas and stories to present to the defendant in furtherance of the plan.

Mr. Farris stated that the defendant established rules and parameters for him to follow when he carried out the plan. When Mr. Farris was ready to kill the Levines, he was to call Colonel March in Mexico, using the code name Bobby Givings, and say "I'm ready to buy the BMW." After he received the call, Colonel March was to email the defendant's sister who would then send regular mail to the defendant. When he received the mail, the defendant was to call his sister, who would then email Colonel March. Mr. Farris was not to kill the Levines until the defendant said it was okay. The alternative plan was that Mr. Farris was not to contact Colonel March or do anything at all until the defendant gave him permission to act. Mr. Farris stated that the defendant "wanted [him] to wait, at least, thirty days because of the videotapes in the jail." He further stated that the defendant told him to delay the killings because "[he] wanted [him] to have some cooling-off time." After he left the jail on October 7, Mr. Farris never spoke with the defendant again.

Mr. Farris stated that in the plans that he and the defendant discussed, Colonel March was to give him a safe place to stay after the killings and would be the channel of communication between him and the defendant. They had several code names to let Colonel March know they had spoken. In addition to Bobby Givings buying a BMW, they also created a scenario with Jesus Roldan and a pottery business. Mr. Farris said that the defendant told him that Colonel March "was the key to this . . . and . . . would help [him], in whatever way he could."

On October 12, after authorities transferred him to the Williamson County Jail, Mr. Farris called Colonel March and asked him if the defendant had contacted him. He also asked Colonel March if he knew about the agreement he had with the defendant, and Colonel March said "No, I'm sorry, I don't know anything." According to Mr. Farris, Colonel March also said that the defendant advised him that Mr. Farris would call and that he was "supposed to listen and talk."

During their conversation, Mr. Farris asked Colonel March to get him a clean gun, and Colonel March told him that he had "a nine." Mr. Farris spoke with Colonel March about how he would carry out the killings and asked him for help. He agreed that the defendant never told him to discuss these things with Colonel March and that Colonel March was only supposed to serve as a communication channel. On October 20, Colonel March told Mr. Farris that he had spoken with the defendant on October 18. Colonel March advised Mr. Farris that he had given the defendant his message and that the defendant was okay with Colonel March and Mr. Farris having contact. Mr. Farris admitted that with the help of authorities, he created several different scenarios that he did not discuss with the defendant and presented them to Colonel March. Mr. Farris stated that as far as he knew, all Colonel March had done was talk to him and the defendant. On October 27, Mr. Farris called Colonel March and told him that he completed the killing. He also told Colonel March on which flight he would arrive in Mexico.

On redirect examination, Mr. Farris testified that he had never testified in court before. He stated that before the taping, the defendant told him how much he hated the Levines on a daily basis. He and the defendant talked about killing the Levines every day before he talked to the police. Mr. Farris explained that when he told the defendant he needed hard facts, he was referring to "exactly where the Levines lived; . . . [and] any information [the defendant] could give [him] like that . . . ." He said that they talked about the defendant having the final say on when he would kill the Levines. Mr. Farris said that he was only to talk to Colonel March when they released him from jail, and he told Colonel March that he was going to kill the Levines. Mr. Farris stated that Colonel March never told him not to kill the Levines. According to Mr. Farris, the defendant told him that Colonel March "had been in the military and that he had weapons." The defendant told Mr. Farris that if he had a clear phone line to talk to Colonel March, then Colonel March would "come up right now and shoot the Levines." The defendant also told him that Colonel March "had . . . four mercenaries ready to come and kill the Levines . . . ."

Mr. Farris recalled that during the recordings, the defendant referenced that they had been talking about the plan for weeks. He also recalled that the defendant told him that he had "been searching and searching and searching for a year for somebody, to have the partner that . . . could watch [his] back and win [sic][.]"

Daron Hall, the Davidson County Sheriff, testified that in October 2005, law enforcement officers requested his help in the investigation of a murder conspiracy. They asked the sheriff's department to move an inmate so that a recording device could be placed in a cell. His department moved the inmate and assigned investigator Kevin Carrell to assist them in placing the recorder in the cell. Sheriff Hall stated that this was the first time his office did anything regarding Mr. Farris. He said that Mr. Farris was incarcerated on April 23, 2005 and moved to protective custody on June 7, 2005. Sheriff Hall testified that Mr. Farris requested to be placed in protective custody because "he was concerned about his safety." Sheriff Hall further testified that on August 12, 2005, the defendant arrived at his facility and was placed in protective custody for "multiple reasons, one of those being a request through [the defendant.]" They placed the defendant in "the [cell] that was available," which was next to Mr. Farris's cell.

On cross-examination, Sheriff Hall testified that inmates were not supposed to cross a red line drawn on the floor in front of the cells. He explained that the purpose of the line was "to prevent contraband from being handed back and forth through inmates and having physical contact with one another." He stated that painting a line on the floor did not always accomplish the policy of preventing contraband and physical contact. On redirect examination he stated that they enforced the policy to the best of their ability, and no one requested that they not enforce the policy as to Mr. Farris and the defendant.

Kevin Carrell, an investigator at the Davidson County Sheriff's Office and a member of the FBI Violent Crimes Task Force, testified that he participated in an undercover investigation of the defendant on October 6, 2005. He assisted in the investigation by having an officer place recorders in Mr. Farris's cell while he and his cell mate were at trial. Mr. Carrell stated that he retrieved the recorder by pretending to conduct an internal affairs investigation. He had Mr. Farris leave the cell, retrieved the tape-recorder from him, and gave him another tape-recorder. The next day, Mr. Carrell retrieved the second tape recorder and turned both recorders over to the police department.

Mr. Carrell testified that they allow the inmates housed in protective custody the same recreation opportunities as inmates in the general prison population. They videotaped the inmates during their recreation time, and they recorded the interactions between Mr. Farris and the defendant. Mr. Carrell stated that the inmate's phone calls are also monitored, but the defendant made unmonitored calls because he was calling outside the country. Mr.

Carrell stated that he personally observed the defendant making a call from the counselor's unmonitored phone on which authorities had placed a court ordered wiretap.

On cross-examination, Mr. Carrell testified that he did not have anything to do with placing the defendant in a cell beside Mr. Farris's. When asked if they enforced the policy preventing inmates from crossing the red line in front of the cell as to the defendant and Mr. Farris, Mr. Carrell explained that the policy was "kinda [sic] like the old seatbelt law . . . it was just one of the things that they could tack onto you, in the event of a ticket." He further testified on redirect examination that, to his knowledge, they did not enforce the rule as to anyone, and he had never seen the rule being enforced.

Sergeant Pat Postiglione testified that he was assigned to the Homicide Cold Case Unit of the Metropolitan Nashville Police Department. He was involved in the investigation of the disappearance of Mrs. March. Sergeant Postiglione stated that they charged the defendant with Mrs. March's death in a sealed indictment. He further stated that the first time the public knew of the indictment was when they arrested the defendant on August 12, 2005 in Los Angeles, California. After they arrested the defendant, Sergeant Postiglione received information from the district attorney's office about Mr. Farris. Based on that information, he met with the district attorney's office, Mr. Farris and his counsel, and Metropolitan Nashville Police Department homicide detective Bill Pridemore. Before the investigation of the defendant, Sergeant Postiglione had no contact with Mr. Farris. Sergeant Postiglione stated that initially Mr. Farris was reluctant to speak with him, but he eventually interviewed Mr. Farris.

After the interview, Sergeant Postiglione corroborated the information Mr. Farris gave him at the interview. Specifically, he corroborated whether Mr. Farris "was in the cell that he described, [and] whether . . . he had made a phone call at [the defendant's] request." Mr. Farris agreed to wear a wire and record his and the defendant's conversations to confirm that what he told the authorities was true. Sergeant Postiglione stated that they instructed Mr. Farris

> that on October the sixth, when he went to court, [he] would come back and tell [the defendant] that his bond had been reduced from three-hundred-thousand dollars to a hundred-and-fifty-thousand dollars, and he would now be able to make bond and proceed with the plan that they had already conspired about.
>
> And the plan was that he would make his bond through his girlfriend, on October the seventh, the following day.

-13-

Sergeant Postiglione further stated that they instructed Mr. Farris to "continue to play the role of the hit man . . . to see how far it went." Mr. Farris recorded his conversations with the defendant, and when the recordings were finished, they returned them to Sergeant Postiglione. After Sergeant Postiglione received the recordings, his office downloaded them and immediately made them into disks to preserve them. Sergeant Postiglione identified the recordings, and the state played them for the jury.

Sergeant Postiglione testified that they took Mr. Farris to the Williamson County Jail after the second recording. He stated that if anyone looked into Mr. Farris, his records would show that he was out on bond rather than transferred to the Williamson County Jail. Mr. Farris continued to assist authorities by making "controlled telephone calls to Mexico" to contact Colonel March and see if he was going to continue with the conspiracy. Mr. Farris made five phone calls to Colonel March. Sergeant Postiglione said that they "were concerned about possible leaks inside the jail," so they moved the time line quicker than the original thirty days. Based on some conversations about weapons that had occurred, Sergeant Postiglione's office wanted to see if Colonel March would commit an overt act by bringing a weapon from Mexico to the United States. They also attempted to have Colonel March wire money to Mr. Farris, but Mr. March was not able to make the wire until November 1, and Sergeant Postiglione's office did not want to wait that long. The third scenario to see if Colonel March would commit an overt act was to have Mr. Farris "fly into the Guadalajara through the airport and be picked up by [Colonel] March, in an attempt to see if [Colonel] March would actually leave his residence and go to the airport to pick up Mr. Farris, believing that he'd just committed two homicides." Sergeant Postiglione testified that he personally observed and recorded the phone calls. Sergeant Postiglione identified the recordings of the conversations between Mr. Farris and Colonel March, and the state played the recordings for the jury.

On October 17, Sergeant Postiglione requested that the counselor's phone inside the jail be wiretapped, and the wiretap was set up on October 21. Sergeant Postiglione asked the FBI in Mexico "[t]o conduct surveillance on [Colonel] March and note his movements, while the phone calls [were] being made." Sergeant Postiglione served an arrest capias on [Colonel] March and the defendant. At the time of his arrest, the defendant asked Sergeant Postiglione "if there was [sic] any co-conspirators" and never asked who he had conspired to kill.

On cross-examination, Sergeant Postiglione testified that when he first received the information from Mr. Farris, he "[a]bsolutely" questioned whether he was being truthful. Sergeant Postiglione said that he was unaware of any discussions about Mr. Farris receiving favorable treatment for providing information. He agreed that he was present when Mr. Farris met with the federal government and that Mr. Farris was hoping for leniency if he gave

truthful, verifiable information. Sergeant Postiglione stated that the police department's investigation determines whether the information is truthful. He further stated that before October 6, the only information they had was Mr. Farris's statements.

Sergeant Postiglione stated that the first time authorities knew about Mr. Farris receiving the Levine's address was on October 6, however, he further stated that he could not "say for certain that he didn't get an address prior to that day." When asked whether there was any indication that the defendant gave Mr. Farris the "green light" to kill the Levines, Sergeant Postiglione said that it was "a matter of interpretation[,]" and his "answer would probably be yes . . . ." Sergeant Postiglione stated that the defendant was not on any of the tapes between Mr. Farris and Colonel March, but they referenced him several times. He agreed that in a transcript of a recording between Colonel March and Mr. Farris, Colonel March stated that he did not know "the specifics of the agreement," he just knew that when "Bobby Givings" called, he was to talk to him. Sergeant Postiglione testified that when Colonel March said that he did not want to know what was going on, "his impression was that he didn't want the details, for very obvious reasons." He further testified that he did not have a tape where the defendant says, "Go kill them[,]" but he did have a recording where Mr. Farris advised the defendant that "[i]t may go down next week" and the defendant did not say, "No, don't do it." Sergeant Postiglione said that his unit also recorded a conversation where the defendant's sister acknowledged an email to the defendant, and the defendant told her, "On second thought don't send me that e-mail of Bobby Givings." He admitted that no specific language was telling Mr. Farris to go forward with the killings, but he stated that "there was a big push on codes and code words and a very covert operation."

On redirect examination, Sergeant Postiglione testified that "Mr. Farris was concerned about being charged with the actual conspiracy or solicitation with [the defendant]." He stated that in the October 20 conversation, when Mr. Farris asked whether Colonel March gave the defendant his message, the message was "that he was looking for the car, looking to buy the car, was looking to purchase a BMW, whatever language they agreed on." On recross-examination, he agreed that when Mr. Farris asked about the message, Colonel March's actual answer was "That I had talked to you? Yes."

At the close of Sergeant Postiglione's testimony, defense counsel asked the court to declare a mistrial arguing that when the court did not allow them to question the witness about things in the transcript, the court prevented him from using the witness to present the defense's theory of the case. The court denied the request for a mistrial, and the state recalled Kevin Carrell as a witness.

Using a diagram of the jail that he had made, Mr. Carrell pointed out the defendant's cell. He said that the defendant was in cell number eight, and Mr. Farris was in cell number

nine. Mr. Carrell stated that they made a surveillance video while they recorded the conversations on October 6. He explained that "the [camera was] in the Special Management Unit on the fourth floor of the Criminal Justice Center. There are cameras mounted at the rear of each of these two quads, and the field of view of the camera is basically to cover the majority of the quad." The state played the surveillance video for the jury.

On cross-examination, Mr. Carrell testified that only the lower right-hand quadrant of the video was pertinent to the placement of Mr. Farris and the defendant. He stated that during recreation time they allow the inmates to "walk around within the quad that they're assigned to . . . for approximately an hour a day." He further stated that the inmates can make phone calls, bathe, and participate in outdoor activities during this time.

Reno Martin testified that he entered a guilty plea to a federal drug charge and was an inmate at a county facility in Bowling Green, Kentucky. He said that he was serving a "nine-year sentence, with a downward departure." He would be eligible for a reduction in his sentence if he cooperated with authorities in his case and other cases. Mr. Martin stated that before he was arrested, he had been a police officer for the City of Cookeville for fifteen years. Mr. Martin testified that because of his drug charges he was incarcerated in protective custody at the Davidson County Criminal Justice Center. He stated that the defendant and Mr. Farris were in the Protective Custody Unit when he arrived in August. He further stated that Mr. Farris's cell was the first one in the unit, and it was next to the defendant's cell. Mr. Martin's cell was three cells down from the defendant's. According to Mr. Martin, they eventually moved him to Mr. Farris's cell on the left side of the defendant, and they moved Mr. Farris to the cell on the right side of the defendant. Mr. Martin stated that he spoke to the defendant and called the defendant's attorney for him.

On October 14, 2005, Mr. Martin made a proffer of information to authorities in hopes of receiving consideration from the federal and state governments. He stated that he told authorities that he thought there was "some type of plan that the Levines were gonna [sic] be injured or harmed." Mr. Martin further stated that he "noticed a lotta [sic] communication between [the defendant] and [Mr. Farris], a lotta [sic] secret talking." He said that he was suspicious the day that Mr. Farris was supposed to get out on bond because the defendant asked to switch recreation time with him so that he could make an important call to his attorney. Mr. Martin said that after the defendant made the call "he paced up and down the hallway a few times and kept going over to the television, attempting to turn it on." According to Mr. Martin, once the television came on, the defendant went to Mr. Farris's door immediately, and they started talking. Mr. Martin heard the defendant tell Mr. Farris "that everything was set, . . . not to discuss it anymore, and 'We're not gonna [sic] talk about nothing' or 'not even gonna [sic] talk with each other anymore.'"

Mr. Martin testified that he overheard phone calls that the defendant made. He stated that during the first call, the defendant was "pretty upset with whoever he was talking to, about money not being transferred yet . . . ." He said that the defendant told the person on the other end that he would call someone else to ensure that the money got there. The defendant made a second call, which Mr. Martin also overheard. Mr. Martin testified that during the second phone call, the person with whom the defendant was speaking "advised him about the money[,]" and the defendant gave that person an account number.

Mr. Martin stated that he and the defendant discussed the custody battle between the defendant and the Levines. Mr. Martin testified that the defendant was "pretty upset at the Levines" and said that "it was good that he wasn't out and had a gun." According to Mr. Martin, the defendant also said that "it shoulda [sic] been them that he'd taken care of . . . ." Mr. Martin also had a conversation with the defendant about Mr. Farris showing up for his second court appearance. The defendant told Mr. Martin that "he thought [Mr. Farris] would show up for the first appearance, but he didn't think he'd ever show up for the second appearance." After discussing Mr. Farris being out on bond with his wife, Mr. Martin told the defendant that they thought Mr. Farris was "a plant by the FBI." Mr. Martin said that after he told the defendant that, the defendant was "very concerned, lost all expression in his face, went pale, [and] began pacing up and down the hallway." Mr. Martin stated that after the defendant was arrested on a conspiracy charge, he asked that Mr. Martin tell his attorney that he never saw the defendant and Mr. Farris talking or interacting with one another.

Michelle Knight, an investigator with the Davidson County Sheriff's Office, testified that an automated system in the jail recorded the inmates' outgoing calls. The system automatically recorded inmate telephone calls, except privileged communications. Ms. Knight had a copy of a phone call made by the defendant to Kathy Breitowich, which the state played for the jury. Ms. Knight stated that a recording at the beginning of the call, which the defendant would have heard, advised him that the system may monitor the call. She said that they did not monitor the outgoing mail in the jail; however, she received a subpoena on November 10, 2005, that required the sheriff's department to monitor the defendant's outgoing mail.

Fletcher Long testified that Colonel March hired him as his attorney for federal and state conspiracy charges. The defendant was Colonel March's co-defendant for the state conspiracy charges. He stated that on February 1, 2006, he and Colonel March were discussing the cases at the Criminal Justice Center, and the defendant entered the room where they were talking. Mr. Long further stated that defendant said to Colonel March, "Dad, I'm not gonna [sic] roll on you; you don't roll on me. We will wear these jumpsuits as a badge of honor, a badge of honor."

-17-

Phillip Taylor testified that he was a Metro Police Officer in the Drug Task Force before becoming employed with the Twentieth Judicial District Drug Task Force at the District Attorney's Office. During his time as a Metro Police Officer, he assisted in the investigation of a conspiracy to commit murder charge that involved the defendant and Colonel March. Mr. Taylor conducted a wiretap of a phone used by the defendant in the counselor's office at the Sheriff's Department. Mr. Taylor said that they first recorded the defendant when he called his wife, Carmen, on October 21, 2005. During this phone call, the defendant also spoke with Colonel March. Mr. Taylor identified a copy of the wiretap cassette he recorded on October 21, and the state played the copy for the jury.

Kenneth John Sena, a Supervisory Special Agent with the FBI, testified that he was assigned to the Guadalajara Regional Office in Guadalajara, Jalisco, Mexico. He stated that he received a request for his assistance in the investigation of a conspiracy to commit murder that involved Colonel March. Through his investigation, Agent Sena learned that Colonel March was living in San Antonio, Tlaquepaque, Jalisco, Mexico. Agent Sena confirmed Colonel March's phone number with Sergeant Postiglione and placed him under surveillance at Sergeant Postiglione's request. On October 27, 2005, while under surveillance, Colonel March left his home and drove to the Guadalajara International Airport. Agent Sena and two Mexican immigration officials confronted Colonel March when he arrived at the airport and asked to speak with him. When asked why he was in Mexico, Colonel March said that "he was there to pick up a gentleman by the name of Bobby Givings." Agent Sena testified that Colonel March said that Bobby Givings was "a friend of a friend" that he had never met. According to Agent Sena, Colonel March was "evasive" when he asked him about the friend of a friend. Agent Sena described Colonel March as appearing "shaken" and "pale" when he approached him and told him who he was. Agent Sena stated that they never detained or arrested Colonel March and that he fully consented to the interview.

On cross-examination, Agent Sena stated that he never spoke with the Levines while he was surveilling Colonel March. Agent Sena said that he accompanied the defendant to Los Angeles and handed him over to U.S. Customs and the FBI.

At the close of the state's proof, the defendant made a motion for judgment of acquittal, which the trial court denied. The defendant waived his right to testify, and the defense presented questions and answers from Colonel March's deposition through a disinterested witness.

Colonel Arthur March testified that he "never in [his] life" called Nathaniel Farris a/k/a Bobby Givings; however, Mr. Farris called Colonel March "all the time." He stated that he had never heard of Mr. Givings before the defendant told him that Mr. Givings was a friend that needed help. He further stated that the defendant did not tell him what type of

help Mr. Givings needed. When he called, Mr. Farris used Colonel March's dog's name, his mother's maiden name, and other code words to notify Colonel March that he had spoken with the defendant. Colonel March stated that he was unaware that Mr. Farris was calling him to elicit help in killing the Levines. He said the Levines "were always in danger," but he did not know of any agreement between the defendant and Mr. Farris when Mr. Farris first called him. He also said that before speaking with Mr. Farris, he did not have an agreement with the defendant to harm the Levines. According to Colonel March, it was his idea to hurt the Levines before this case happened, and "[the defendant] never mentioned harming the Levines." Colonel March had not followed up on his idea to harm the Levines, and he stated that "[Bobby] Givings" suggested that he take action against them. When Mr. Farris called he would talk about instruments and surveillance. Colonel March said that Mr. Farris told him "not to talk to [the defendant] about Mr. Givings" and "not to . . . let anybody know." Also, Colonel March was to send any communication to Ms. Breitowich. Colonel March said that he never talked to the defendant about what Mr. Farris said to him, and he only told the defendant that "he had made contact." He stated that when Mr. Farris would go into detail about killing the Levines, he told him that he "didn't want to know anything about it." According to Colonel March, he did not know that Mr. Farris a/k/a Bobby Givings was talking about killing the Levines until the "second or third phone call, maybe the first."

On cross-examination, Colonel March testified that he pled guilty for his involvement in the conspiracy to kill the Levines. He could not remember whether he and the defendant had used code names to communicate before the defendant told him Bobby Givings would be calling. Colonel March said that the defendant told him not to talk on the phone or write anything about Bobby Givings. Colonel March recalled a conversation where he told the defendant that "it was gonna [sic] happen next week." When Colonel March was asked if there was any question that he intended for the Levines to be killed and hoped they would be killed, he answered, "Sure, several times."

The court charged the jury, and based on the evidence presented the jury found the defendant guilty of one count of conspiracy to commit murder and two counts of solicitation to commit first degree murder. The court merged the solicitation to commit first degree murder counts into the conspiracy count. The court entered a judgment of conviction for the conspiracy count only and sentenced the defendant as a Range I Standard offender to twenty-four years in the Tennessee Department of Correction to be served consecutively to the defendant's sentence in case No. 2004-D-3113. The defendant filed a motion for judgment of acquittal or in the alternative, for a new trial, which the court denied. The defendant timely appealed.

**Analysis**

On appeal, the defendant claims several errors occurred during his trial, the court's charge to the jury, and his sentencing. Specifically, the defendant raises the following issues: (1) whether a fatal variance existed between the evidence presented at trial and the allegations in count one of the indictment; (2) whether solicitation to commit first degree murder is protected speech under the First Amendment; (3) whether the trial court erred in denying the defendant's motion for a mistrial; (4) whether the trial court erred in admitting evidence of the defendant's discussions about express kidnappings in Mexico; (5) whether the cumulative effect of the errors during the defendant's trial violated his due process guarantees, (6) whether the trial court committed plain error by failing to instruct the jury concerning the *mens rea* for the discrete elements of conspiracy to commit a homicide; (7) whether the trial court's instruction of criminal responsibility permitted the jury to impute the conduct of another to the defendant; (8) whether the trial court erroneously denied the defendant's request to instruct the jury that they could not convict the defendant of more than one offense; (9) whether the defendant's sentence is excessive; and (10) whether the Sixth Amendment requires that the facts necessary to impose consecutive sentences be found by the jury or admitted by the defendant.

1. Variance

The defendant argues that the proof presented by the state at trial was fatally at variance with the allegations in count one of the indictment. The indictment at issue reads as follows:

THE GRAND JURORS of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that:

**ARTHUR WAYNE MARCH and PERRY AVRAM MARCH**

on **divers days of September and October, 2005**, in Davidson County, Tennessee and before the finding of this indictment, did **knowingly** agree with another that one or more of them would engage in conduct that constitutes the offense of **First Degree Murder**, with each having the culpable mental state required for the commission of that offense, and with each acting for the purpose of promoting or facilitating that commission of the offense, and in furtherance of the conspiracy did engage in one or more of the following overt acts:

1. **Perry Avram March solicited Russell Nathaniel Farris a.k.a. Bobby Givings to murder Carolyn and Lawrence Levine.**

**2. Perry Avram March provided written information to Russell Nathaniel Farris a.k.a. Bobby Givings to assist him in committing the murders of Carolyn and Lawrence Levine.**

**3. Arthur Wayne March agreed to pick up Russell Nathaniel Farris a.k.a. Bobby Givings at the airport in Guadalajara, Mexico and provide him with housing and money after the murders of Carolyn and Lawrence Levine were committed in Nashville, Tennessee.**

**4. On October 27, 2005, after receiving a phone call from Russell Nathaniel Farris a.k.a. Bobby Givings Indicating that the murders had been committed, Arthur Wayne March did go to the airport in Guadalajara, Mexico to pick up Russell Nathaniel Farris a.k.a. Bobby Givings.**

Wherefore, **Arthur Wayne March and Perry Avram March** did conspire to violate Tennessee Code Annotated **§39-13-202**, in violation of Tennessee Code Annotated §39-12-103, and against the peace and dignity of the State of Tennessee.

The purpose of an indictment is to give the defendant notice of the offense charged, give the court an adequate ground upon which a judgment may be entered, and provide the defendant with protection against double jeopardy. *See State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991). "When the evidence adduced at a trial does not correspond to the elements of the offense alleged in the charging instrument, there is a variance." *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994). A variance between the indictment and the proof will be considered fatal if the variance is both material and prejudicial. *See State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984). A defendant suffers no harm from the variance unless it affects his substantial rights. *Id.* "[A] variance does not prejudice the defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense; all other variances must be considered to be harmless error." *Id.* The error is not reversible error when the defendant is sufficiently aware of the charge and can adequately prepare for trial. *Id.* at 592. However, if there is a fatal variance, then the proof is legally insufficient to support the charges in the indictment, and a reversal of the conviction and dismissal of the prosecution is appropriate. *See Keel,* 882 S.W.2d at 416 (citing *McLean v. State*, 527 S.W.2d 76, 81-82 (Tenn. 1975); *Brown v. State*, 39 S.W.2d 746, 747 (Tenn. 1931)).

The defendant contends that the indictment alleged that he and Colonel March "agreed with some third person who himself agreed to act to further or promote or facilitate the actual accomplishment of the murder(s) and specifically intended that fatal result." (Emphasis omitted)  The defendant argues that because the indictment did not accuse him and Colonel March of conspiring with each other or one another, there was a fatal variance between the indictment and the proof at trial.  The defendant claims that the state failed to adduce any proof of the facts charged in the indictment, and thus the defendant is entitled to reversal of his conviction in count one and dismissal with prejudice.  The state responds by asserting that the indictment alleges that "[Colonel] March agreed with another - the defendant - and the defendant agreed with another - [Colonel] March - that one of them would commit a murder."  The state asserts that the indictment alleged and the proof at trial established that the defendant and Colonel March conspired to murder the Levines.

The record shows that no fatal variance existed between the indictment and the proof at trial.  Here, the indictment recited the statutory language and listed the relevant code section, which sufficiently informed the defendant of the charges against him.  The state was required to prove that the defendant conspired with another that one of them would commit a murder.  The evidence at trial showed that the defendant and Colonel March conspired to have a third person kill the Levines.  The substance of the crime of conspiracy to commit first degree murder was the agreement between the defendants that someone would intentionally kill the Levines.  The identity of the killer was not an element of the offense that the state had to prove.  Testimony showed that both men committed overt acts in furtherance of the conspiracy.  While the evidence at trial showed that the defendant conspired with Colonel March to have Mr. Farris kill the Levines and the indictment alleges that either the defendant or Colonel March would do the killing, this variance is neither material nor prejudicial.  *See generally State v. Mayes*, 854 S.W.2d 638, 641 (Tenn. 1993) (holding that where the indictment specifies the purchaser of illegal narcotics but the proof reveals that the defendant actually sold them to another person, the variance is not material and does not prejudice the defendant's substantial rights.)  The indictment sufficiently informed the defendant of the charges against him so that he could prepare his defense and not be misled or surprised at trial, and the variance did not present a danger that the defendant may be prosecuted a second time for the same offense.  Accordingly, we conclude that the defendant is without relief for this issue.

### 2. First Amendment

The defendant next raises the issue of whether the First Amendment to the United States Constitution and/or Article I, section 19 of the Constitution of the State of Tennessee protect solicitation to commit first degree murder.  The defendant argues that the application of Tennessee Code Annotated section 39-12-102 to his case is unconstitutional.  In response,

the state argues that the defendant's actual solicitation of first degree murder is categorically excluded from protection under the First Amendment. The state also argues that the defendant has waived his claim of state constitutional protection by failing to support his claim with an argument and citations to authority. We agree that the state constitutional law claim is waived because the defendant did not present an argument or cite to any authority is support of the issue, and we address the merits of the issue as it relates to the United States Constitution. *See* Tenn. R. App. P. 27(a)(7); Tenn. R. Ct. Crim. App. 10(b).

Whether the First Amendment protects the defendant's speech is a question of constitutional law. Accordingly, our review of the issue is *de novo* without a presumption of correctness. *State v. Burns*, 205 S.W.3d 412, 414 (Tenn. 2006) (citing *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001)).

The First Amendment to the United States Constitution guarantees the right to free speech. *U.S. Const. amend. I.* However, the right to free speech is not absolute, and there are limitations on the right to free speech. The United States Supreme Court, in *Schenck v. United States*, 249 U.S. 47 (1919), articulated a "clear and present danger" test to determine when the government may punish the advocacy of illegal conduct. In *Bradenburg v. Ohio*, the Court refined the test to distinguish mere advocacy of the use of force or of law violation from incitement to imminent lawless action. *Brandenburg v. Ohio,* 395 U.S. 444, 447-49 (1969). The Court has stated that "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection." *United States v. Williams,* 553 U.S. 285, 128 S. Ct. 1830, 1841 (2008) (citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498, 69 S.Ct. 684, 93 L.Ed. 834 (1949)). In *Williams* the Court distinguished "between a proposal to engage in illegal activity and the abstract advocacy of illegality." *Id.* at 1842 (citing *Brandenburg,* 395 U.S. at 447-48).

The jury found the defendant guilty of solicitation to commit first degree murder in violation of Tennessee Code Annotated section 39-12-102. That code section provides that a defendant who

> by means of oral, written or electronic communication, directly or through another, intentionally commands, requests or hires another to commit a criminal offense, or attempts to command, request or hire another to commit a criminal offense, with the intent that the criminal offense be committed, is guilty of the offense of solicitation.

> . . . [I]t is no defense that the person solicited is unable to commit the offense solicited because of the lack of capacity, status, or characteristic needed to

commit the offense solicited, so long as the person soliciting or the person solicited believes that either or both have such capacity, status, or characteristic.

Tenn. Code Ann. § 39-12-102 (2005).

Applying the "clear and present danger test," the defendant argues that solicitation of first degree murder is constitutionally protected. The state asserts that under *Williams* the appropriate question is whether the plans were abstract or actual and argues that the "clear and present danger" test does not apply. We agree with the defendant that the clear and present danger test applies; however, we conclude that Tennessee Code Annotated section 39-12-102 is valid under that test.

Under the *Bradenburg* "clear and present danger" test, "the constitutional guarantees of free speech and free press do not permit a [s]tate to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg,* 395 U.S. at 447. This court must weigh the gravity of the crime against its improbability to decide whether an invasion of First Amendment rights is justified to prevent the danger presented. *Dennis v. United States,* 341 U.S. 494, 510 (1951) (citing *United States v. Dennis,* 183 F.2d 201, 212 (2d Cir. 1950) *aff'd,* 341 U.S. 494 (1951)). The defendant concedes that the gravity of the violence advocated was great; however, he claims that the First Amendment protected his speech because Mr. Farris was incarcerated and could not kill the Levines. In addition, the defendant claims that his speech was protected because Mr. Farris was role playing. Therefore, the defendant argues that his spoken and written words neither posed nor caused actual harm or risk of imminent harm. We disagree.

The evidence reveals that the defendant discussed the plan to kill the Levines with Mr. Farris believing that Mr. Farris had killed before. Although Mr. Farris was incarcerated when the defendant solicited him to kill the Levines, the defendant thought that Mr. Farris would be getting out on bond shortly and would go forward with the plan to kill the Levines once he was out on bond. Believing that he was sincerely committed to the plan to kill the Levines, the defendant provided assistance to Mr. Farris to enable him to carry out the plan. "Offers to . . . engage in illegal activity do not acquire First Amendment protection when the offeror is mistaken about the factual predicate of his offer." *Williams,* 553 U.S. 285, 128 S.Ct. at 1843. Likewise, "[t]here is no First Amendment exception from the general principle of criminal law that a person attempting to commit a crime need not be exonerated because he has a mistaken view of the facts." *Id.* at 1845. The defendant's act of soliciting a person, that he believed was a hit man, to kill the Levines actually constituted the crime. As such, the defendant's crime was not only imminent, but it was consummated. No constitutionally

protected right exists to solicit murder, and as such, Tennessee Code Annotated section 39-12-102 may punish actions that include speech made for the sole purpose of procuring activities that are illegal. Accordingly, we conclude that the First Amendment does not protect solicitation to commit first degree murder, and the jury's guilty verdict is constitutional.

### 3. Necessity of a Mistrial

Next, the defendant argues that the trial court erred when it denied his motion for a mistrial. The defendant asserts that Mr. Levine's testimony allowed prior evidence of the defendant's uncharged misconduct to be placed before the jury.

During his direct examination, Mr. Levine and the prosecutor engaged in the following exchange:

| [Prosecutor]: | And, when you were given that information, what did you and your wife do? |
|---|---|
| [Mr. Levine]: | Well, we took precautions, 'cause we were scared. This was not the first time Perry and Arthur March had attempted to kill us; so we were scared. |

Defense counsel objected and asked for a curative instruction. The parties had a bench conference and defense counsel moved for a mistrial, which the court denied. The court sustained the objection and admonished Mr. Levine to "just answer the questions that [he was] asked." The court also instructed the jury that the "question had nothing to do with what we're on trial for, no basis whatsoever in response to the question that was asked by the [s]tate and you should disregard it completely."

While cross-examining Mr. Levine, defense counsel began asking Mr. Levine about his trip to Mexico to get his grandchildren. The prosecution interrupted Mr. Levine's testimony, and the parties had a bench conference where the prosecutor warned defense counsel that he was "headed down the path of when . . . they went to Mexico and took the children for their visitation. If [he kept] going there, [Mr. Levine was] gonna [sic] say that Arthur March had a gun and threatened them and chased them and all that stuff." The parties discussed Mr. Levine's testimony with the court and when the bench conference was completed, the court instructed Mr. Levine that,

> [I]f the [s]tate is of the opinion that they need to solicit from you further relevant information that . . . you do not have the opportunity to bring out from your perspective, during . . . the direct testimony, they'll do that.

But let's let them do that and not you do that.  So, I'll try to be fair to you, will be fair to you, with the understanding that we're here to give everyone a fair trial, including the [s]tate.

So, if they think there needs to be further information, they'll elicit it.  And we'll see if there's an objection.

The cross-examination of Mr. Levine continued.  During cross-examination, defense counsel asked Mr. Levine if the relationship between the defendant and his family was strained when the federal judge decided that the children should be returned to Mexico.  When Mr. Levine answered, the following exchange occurred:

[Mr. Levine]:     Yes.  It was . . . that trip to Mexico, when Mr. March and his father attempted - -

THE COURT:     All right.  That's - -

[Mr. Levine]:     - - to kill us.

THE COURT:     - - that's - - Mr. Levine, why are you doing this?

[Mr. Levine]:     Because that's what happened, sir.

THE COURT:     They didn't ask you that.

[Mr. Levine]:     The - -

THE COURT:     I've tried to tell you, they've tried to tell you. The [s]tate doesn't want . . .to start all this over again.

[Mr. Levine]:     Okay, sir.

THE COURT:     Why do you? Just answer the questions.

[Mr. Levine]:     Yes, sir.

After this colloquy, defense counsel renewed his motion for mistrial, and the trial court denied the renewed motion.

The decision of whether or not to declare a mistrial lies within the sound discretion of the trial court. *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A court should declare a mistrial in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. *See id.*; *State v. Jones*, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); *Arnold v. State,* 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." *State v. Millbrooks,* 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting *Arnold,* 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." *State v. Knight,* 616 S.W.2d 593, 596 (Tenn. 1981). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. *Land,* 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. *Id.* When determining whether a mistrial is necessary because inappropriate testimony was presented to the jury, this court considers the following nonexclusive factors: "(1) whether the state elicited the testimony; (2) whether the trial court gave a curative instruction; and (3) the relative strength or weakness of the state's proof." *State v. Lawrence Taylor*, No. W2002-00183-CCA-R3-CD, 2003 WL 402276, at *4 (Tenn. Crim. App., at Jackson, Feb. 14, 2003).

The defendant argues that when Mr. Levine told the jury that the defendant had previously tried to kill him and his wife, it allowed evidence of uncharged crimes, wrongs and acts of the defendant in contravention of the court's *in limine* ruling that such evidence was inadmissible. The defendant further argues that because Mr. Levine was "a member of the bar who should know better," this court should not reward his misconduct. In addition, the defendant complains that the trial court did not issue a curative instruction after the second time Mr. Levine mentioned the defendant's previous attempts to kill him. The state contends that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial because the state did not elicit the testimony, the court gave curative instructions, and there was overwhelming evidence against the defendant.

We see no abuse of discretion in the denial of the motion for a mistrial. In this matter, the defendant made a motion *in limine* to suppress any evidence of uncharged crimes, wrongs and acts of the defendant. Mr. Levine's comments regarding the defendant's previous attempts to kill him and Mrs. Levine were undoubtedly improper, and Mr. Levine should have known better. However, we do not agree that the comment created a "manifest necessity" for a mistrial. First, there is no indication that the prosecutor deliberately elicited the comments to create an inference of guilt of the defendant. *See Honeycutt v. State,* 544 S.W.2d 912, 917-18 (Tenn. Crim. App. 1976). Mr. Levine's comments were unresponsive and unsolicited. Second, the court gave a curative instruction immediately after the first time Mr. Levine made an improper comment. The court instructed the jury that the "question had

nothing to do with what we're on trial for, no basis whatsoever in response to the question that was asked by the [s]tate and you should disregard it completely."[2]  Although the court gave no curative instruction after the second improper comment by Mr. Levine, the defendant requested no such instruction.  A defense counsel's failure to request a curative instruction is a failure to take action "reasonably available to prevent or nullify the harmful effect of an error."  Tenn. R. App. P. 36(a); *see also State v. Jones,* 733 S.W.2d 517, 522 (Tenn. Crim. App. 1987) (holding that "failure to request curative instructions" is failure to take action that is "reasonably available to prevent or nullify the harmful effect of an error").  Additionally, when charging the jury, the court instructed them not to concern themselves with the rulings on admissibility and advised them that "as to any question to which an objection was sustained, [they] must not speculate as to what the answer might have been or as to the reason for the objection; and [they] must assume that the answer would be of no value to [them] in [their] deliberations."  The jury is presumed to have followed the court's curative instructions.  *State v. Smith,* 893 S.W.2d 908, 923 (Tenn. 1994) (citing *State v. Baker,* 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987).  Finally, the state's case against the defendant was strong and suggests that evidence would have compelled the jury to convict the defendant despite the improper comments. The proof at trial showed that the defendant had a plan in place with Mr. Farris and Colonel March to kill the Levines.  The state presented the jury with several hours of tape-recorded conversations between the defendant and Mr. Farris that discussed the plan to kill the Levines.  In these conversations, the defendant talked about why he wanted the Levines killed, provided Mr. Farris with information to help him kill the Levines, and discussed preventing authorities from tracing any evidence from the killings.  In addition, the jury heard conversations between Mr. Farris and Colonel March where Mr. Farris used the code words that the defendant instructed him to use when talking with Colonel March.  Colonel March understood the code words and told Mr. Farris to let him know what he could do to help him.  Further, Colonel March and Mr. Farris discussed the Levines schedule and obtaining an instrument to kill the Levines.  The state presented proof that, according to the plan, Colonel March went to the airport to pick up Mr. Farris believing that he had killed the Levines.  Accordingly, we conclude that the trial court did not abuse its discretion in denying the defendant's request for a mistrial.  This issue is without merit.

### 4. Evidence of Express Kidnappings

The defendant next argues that the trial court erred when it admitted evidence of alleged discussions about express kidnappings that the defendant had with Mr. Farris.

---

[2] While the defendant contends that the court commented on the question asked by the prosecutor and did not give a curative instruction for Mr. Levine's answer, we gather from context of the instruction that the trial judge intended to say that the *answer* "had no basis whatsoever in response to the question that was asked," but mistakenly said question.

Specifically, the defendant argues that the admission of proof that there was a future plan to commit crimes unrelated to the instant offenses was not probative of the defendant's intent and did not show the relationship between the defendant and Mr. Farris. The defendant claims that the evidence was solely propensity evidence in violation of Rule 404(b) of the Tennessee Rules of Evidence. The state contends that the court properly admitted evidence of the defendant's discussions about express kidnappings because "the defendant's discussions of express kidnappings were integral parts of his solicitation of [Mr.] Farris' assistance." We agree with the state.

> Rule 404(b) of the Tennessee Rules of Evidence provides that:
> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. While evidence of a prior crime, wrong or act is not admissible to prove that a defendant had the propensity or disposition to commit the crime, it may be relevant and admissible to prove issues such as identity, motive, opportunity, or absence of mistake or accident.

A trial court's decision on an issue falling under Rule 404(b) is subject to an abuse of discretion standard. "Where the admissibility of the proffered evidence must also comply with Rule 404(b) and the trial court has followed the procedure mandated by that rule, it appears that the same standard, abuse of discretion, would be applicable." *State v. DuBose,* 953 S.W.2d 649, 652 (Tenn. 1997) (citing *State v. Brewer,* 932 S.W.2d 1, 24 (Tenn. Crim. App. 1996)). "Although evidence of a prior act is not admissible to prove propensity or disposition to commit a crime, it may arguably be relevant to issues such as identity, intent, motive, or rebuttal of accident or mistake." *State v. Orlando Crayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App., at Jackson, June 27, 2001); *see also* Tenn. R. Evid. 404, Advisory Comm'n Cmnts. To admit such evidence, Rule 404(b) specifies the following:

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Should a review of the record indicate that the trial court substantially complied with the requirements of Rule 404(b), the trial court's admission of the challenged evidence will remain undisturbed absent an abuse of discretion. *State v. James*, 81 S.W.3d 751, 759 (Tenn. 2002); *Dubose*, 953 S.W.2d at 652.

Upon review of the record, we conclude that the court fulfilled the necessary prerequisites to permit it to rule on potential 404(b) evidence. Specifically, the court held a jury-out hearing to determine whether a material issue existed, other than proving conduct conforming with a character trait, that would allow the admission of the evidence. After argument by the parties, the court concluded that the state offered the testimony to prove the defendant's intent, premeditation, and the absence of mistake or accident. The court stated:

> [I]n the [c]ourt's mind, there . . . are material issues that exist here. [W]e've had *voir dire* and opening statements about [the defendant] being "petted," . . . into discussing these, [Mr. Farris] pushed [the defendant] into this crime, they were imaginary plans, angry people just talking.
>
> And, more important[ly] . . . the [s]tate obviously has to prove intent, had to discount these defense arguments that are being proposed[,] . . . but they have to prove that [the defendant] had the intent, culpable mental state, being intentionally to carry out these particular crimes, both the conspiracy and the solicitation . . . .
>
> . . . .
>
> [W]hy else would he be doing this, other than he has Mr. March's statements and discussion about how he's gonna [sic] be taken care of.
>
> . . . .
>
> I mean, it, to the [c]ourt, goes to showing that seriousness or the intent issues that the [s]tate has to prove and shows the relationship between these parties, in that . . . if it doesn't come in, . . . then I suppose the scenario that's left is, well, Mr. Farris is gonna [sic] do this conspiracy out of the goodness of his heart and, once it's done, do what? Just live happily ever after in Nashville, I guess.
>
> . . . .

In weighting that, the probative nature of that particular information and whether that probative value is outweighed by the danger of unfair prejudice, I will say this: I don't think the transcripts do that at all.

[I] don't think, out of an abundance of caution, that it should be elicited from Mr. Farris . . . that Mr. March had admitted doing those in the past . . . .

. . . .

But, . . . in terms of the [404](b) issues, we've had the hearing. There . . . are multiple reasons to allow it in and multiple reasons that make it relevant, in terms of the intent, the . . . serious nature of the discussions and showing the relationship between the parties.

We agree and detect no abuse of discretion by the trial court in allowing the testimony of Mr. Farris regarding discussions with the defendant about express kidnappings. The evidence was relevant to the jury's consideration of the defendant's motive for soliciting Mr. Farris to kill the Levines. The court admitted the evidence to show that the defendant intended to have the Levines murdered, recruited Mr. Farris to murder them, and promised to reward Mr. Farris when he killed them. Because there were multiple reasons to admit the evidence other than to show a propensity, the trial court properly found that any unfair prejudice did not outweigh the probative value of the evidence of the discussions about express kidnappings. Moreover, the court prohibited Mr. Farris from testifying that the defendant admitted that he had done express kidnappings before. Therefore, we conclude that the trial court did not err in permitting Mr. Farris's testimony regarding future express kidnappings.

5. Failure to Instruct as to the *Mens Rea*

The defendant's next argument is that, when charging the jury, the trial court committed plain and prejudicial error when it did not fully instruct the jury as to the *mens rea* applicable to the discrete elements of conspiracy to commit a homicide. The defendant asserts that the court's charge to the jury specified the mental state applicable to the crime that was the object of the conspiracy, but it did not specify the mental state applicable to the act of entering into the conspiracy. The state contends that the court did not commit plain error because no clear and unequivocal rule of law required the court to instruct the jury as to the *mens rea* for the existence of the agreement in a conspiracy.

A plain error is an error whose correction is necessary to prevent a "miscarriage of justice." *United States v. Frady,* 456 U.S. 152, 163 (1982). For this court to conclude that the trial court committed plain error, the following factors must be present:

-31-

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused [must not have waived] the issue for tactical reasons; and (e) consideration of the error [must be] "necessary to do substantial justice."

*State v. Terry*, 118 S.W.3d 355, 360 (Tenn. 2003)(quoting *State v. Adkisson,* 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). In order for this court to recognize that a plain error has occurred, the record must establish all five factors. *Id.* (citing *State v. Smith,* 24 S.W.3d 274, 283 (Tenn. 2000). If it is clear from the record that any one factor cannot be established, then this court need not complete consideration of the other factors. *Id.* The defendant has the burden of persuasion regarding plain error claims. *See United States v. Olano,* 507 U.S. 725, 734 (1993).

Because the record suggests that the other factors have been satisfied, we now address whether the trial court's failure to instruct the jury as to the *mens rea* for the discrete elements of conspiracy to commit homicide breached a clear and unequivocal rule of law. In criminal cases, a trial court has an obligation to instruct the jury fully on the general principles of law that are relevant to the issues raised by the evidence. *See State v. Burns,* 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison,* 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder,* 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). To satisfy the defendant's constitutional right to a trial by jury, a "clear and distinct exposition of the law" is necessary. *State v. Phipps,* 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee,* 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987)). Questions concerning the propriety of jury instructions are mixed questions of law and fact, and thus our standard of review here is *de novo*, with no presumption of correctness. *State v. Rush,* 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley,* 38 S.W.3d 521, 524 (Tenn. 2001).

In general, "a defendant has a constitutional right to a correct and complete charge of the law." *State v. Teel,* 793 S.W.2d 236, 249 (Tenn. 1990), *superceded by statute on other grounds as stated in State v. Reid,* 91 S.W.3d 247 (Tenn. 2002). On appeal, when determining whether jury instructions are erroneous, this court should "review the charge in its entirety and read it as a whole." *State v. Hodges,* 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson,* 878 S.W.2d 530, 555 (Tenn. 1994), *abrogated by State v. Saylor*, 117 S.W.3d 239 (Tenn. 2003)). A jury instruction is prejudicially erroneous "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id.* (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State,* 547 S.W.2d 531 (Tenn. 1977)). Even if a trial court errs when instructing the jury, such instructional error may be found harmless. *State v. Williams,* 977 S.W.2d 101, 104 (Tenn. 1998).

Four culpable mental states exist in Tennessee: intentional, knowing, reckless, and criminal negligence. *See* Tenn. Code Ann. § 39-11-302 (2006). If the statute that defines the offense does not plainly dispense with a mental element, then "intent, knowledge, or recklessness suffices" to establish the culpable mental state. Tenn. Code Ann. § 39-11-301(c); *see also State v. Page*, 81 S.W.3d 781, 786 (Tenn. Crim. App. 2002). The trial court must give clear instructions to the jury about the mental state for every element if the elements of an offense have distinctly varied *mens rea*. *State v. Howard*, 926 S.W.2d 579, 587 (Tenn. Crim. App. 1996), *overruled on other grounds in State v. Williams*, 977 S.W.2d 101 (Tenn. 1998). Intentional, knowing, reckless, and criminal negligence are "defined with reference to two or three of the following possible conduct elements: (1) nature of defendant's conduct, (2) circumstances surrounding the defendant's conduct, and (3) result of the defendant's conduct." *Page,* 81 S.W.3d at 787 (citing Tenn. Code Ann. § 39-11-302). Under Tennessee Code Annotated section 39-11-302,

> (a) "Intentional" refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result. (b) "Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. (c) "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. (d) "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

The defendant claims that the trial court erred when it did not "address the culpable mental state which must be present with regard to the act of entering into the conspiratorial agreement itself." The state contends that "the defendant has failed to demonstrate that, at the time of trial, it was clearly and unequivocally established that, in a trial for conspiracy,

that trial court must instruct the jury on the mental element required to show the existence of an agreement."

When charging the jury, the court instructed them that:

[T]o find the Defendant guilty of criminal conspiracy, the [s]tate must have proven beyond a reasonable doubt the existence of the following essential elements:

> (1) that the Defendant entered into an agreement with one or more people to commit the offense of First-Degree Murder. It is not necessary that the object of the agreement be attained; and
> (2) that each of the parties to the conspiracy had the intent to commit the offense of First-Degree Murder. The State is alleging the parties involved in this conspiracy are Arthur March and Perry March; and
> (3) that each party, acting for the purpose of promoting or facilitating the commission of the offense of First-Degree Murder, agreed that one or more of them would engage in the conduct which constitutes the offense of First-Degree Murder; and
> (4) that one of the parties to the conspiracy committed an overt act in furtherance of the conspiracy. An overt act is an act done by one of the parties, to carry out the intent of the conspiracy; and it must be a step toward the execution of the conspiracy.

The court further went on to explain that "the essence of the offense of conspiracy is an agreement to accomplish a criminal or unlawful act, the agreement need not be formal or expressed; . . . and it may be proven by circumstantial evidence." The court repeated the instruction for the charges of conspiracy to commit second degree murder and voluntary manslaughter.

After reviewing the jury instructions in this case, we conclude that no breach of a clear or unequivocal rule of law occurred. No rule of law requires a trial court to instruct the jury regarding a *mens rea* for the agreement component of a conspiracy. The trial court in this case properly instructed the jury with respect to the *mens rea* elements of conspiracy. The jury received a correct and complete charge of the law. Thus, we conclude that no plain error occurred, and, as such, the defendant is not entitled to relief on this issue.

### 6. Criminal Responsibility Instruction

The defendant contends that when the trial court instructed the jury as to criminal liability for the conduct of another, the court allowed the jury to impute Mr. Farris's conduct

to the defendant for purposes of the conspiracy charge. The defendant further contends that the court's instructions "misled the jury and prejudiced the [d]efendant" because they invited the jury to impute Mr. Farris's made-up, role-playing conduct to the defendant. The state asserts that to charge the jury correctly and completely, the trial court had a duty to instruct them on both the elements of the crimes and the theory of criminal responsibility.

Under the United States and Tennessee Constitutions, a defendant has a right to trial by jury. *State v. Garrison,* 40 S.W.3d 426, 432 (Tenn. 2000). A defendant also has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. *Id.* In evaluating claims of error in the jury charge, this court must review the charge in its entirety and read it as a whole. *State v. Leach,* 148 S.W.3d 42, 58 (Tenn. 2004). A charge shall be considered prejudicially erroneous if it fails to submit the legal issues fairly or if it misleads the jury as to the applicable law. *Hodges,* 944 S.W.2d at 352.

In this case, the state requested that the trial court instruct the jury as to criminal responsibility for the conduct of another. The court denied this request stating that

> if [the court] instructed that, it would be even more confusing to the [j]ury and maybe lessen, from their perspective, the understanding about what's required for criminal conspiracy to be shown, since the criminal[]conspiracy instruction only uses that "each party acting with the purpose of promotion or [facilitating]." It doesn't use that other language . . . the criminal responsibility [language] . . . .

Later, when charging the jury on conspiracy to commit first degree murder, the trial court instructed them that

> [a]s to the essential elements of First-Degree Murder, criminal responsibility for conduct of another is defined as "the defendant is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant or defendants, solicit or solicits, direct or directs, aid or aids, or attempts to aid another person to commit the offense.

When instructing the jury on conspiracy to commit second-degree murder and conspiracy to commit voluntary manslaughter, the court instructed to jury to refer to this definition of criminal responsibility.

Upon review, we note that the defendant does not explain how the trial court's preliminary remarks prejudiced his trial other than his contention that Mr. Farris was pretending to be a hit man and did not intend to harm the Levines. Furthermore, the defendant does not cite relevant authority in support of his contention. Also, we note that the criminal responsibility portion of the jury charge corresponds with Tennessee Jury Pattern Instructions and closely follows the statutory definition set forth in Tennessee Code Annotated section 39-11-402. Looking at the trial court's instructions, it is our view that the trial court was simply providing the jury with a clear, complete, and correct statement of the law. The jury instructions in this case fairly defined the issues and did not mislead the jury. Accordingly, we conclude that the trial court did not err by commenting on criminal responsibility prior to reading the jury charge in its entirety. This issue is without merit.

### 7. Dual Conviction Instruction

The defendant next argues that the trial court committed an error when declining the defendant's request that the jury be instructed that they may not convict the defendant of more than one of the offenses of solicitation or conspiracy. The defendant further argues that the correct remedy for the trial court's error is dismissal of all convictions. The state responds by asserting that the statutory prohibition of dual convictions for solicitation and conspiracy governs the entry of judgment and not the jury verdict, therefore, the trial court was not obligated to instruct the jury on the statutory prohibition of dual convictions.

Defense counsel requested that the trial court instruct the jury that they may not convict the defendant of both solicitation and conspiracy pursuant to Tennessee Code Annotated section 39-12-106(a). Under that code section, a defendant "may not be convicted of more than one (1) of the offenses of criminal attempt, solicitation or conspiracy for conduct designed to commit or to culminate in the commission of the same offense." Tenn. Code Ann. § 39-12-106(a). The defense asserted that under *State v. Ruby Breeden, Billy Nicely, and Marsha Sutton,* such an instruction was appropriate. *See State v. Ruby Breeden, Billy Nicely, and Marsha Sutton*, No. E2004-01512-CCA-R3-CD, 2005 WL 3199280, at *1 (Tenn. Crim. App. at Knoxville, Nov. 30, 2005) (concluding that the trial court's instruction that the defendant could only be found guilty of one of the offenses of conspiracy or attempted murder was proper). Defense counsel further asserted that the jury should decide which offense to convict the defendant of, and if the trial judge merged the offenses after the jury returned a guilty verdict on more than one, then the trial judge would be invading the province of the jury. The trial court denied the defense's request and instructed the jury that

> [t]he crime charged in each count of the [i]ndictment is a separate and distinct offense. You must decide each charge separately on the evidence and the law applicable to it.

The [d]efendant may be found guilty or not guilty of any or all of the offenses charged. Your finding as to each crime charged must be stated in your verdict.

After deliberating, the jury returned guilty verdicts on all three counts. When sentencing the defendant, the trial court reserved ruling on sentencing for the solicitation counts and stated

In terms of the conspiracy to commit murder and Counts Two and Three of that particular indictment and the solicitation, I'm not going to impose sentences on Counts Two and Three, because I think it was the appropriate thing to do to allow the [j]ury to return verdicts, because otherwise, if I were to have taken . . . one set or other of that particular charges (sic) away from the [j]ury, then if something occurred with the other conviction on appeal or motion for new trial, then it'd have to be retried, if the [j]ury had not rendered a verdict as to all the counts.

....

Obviously, the [c]ourt can fashion a sentence in either of those particular scenarios, Count Two and Three together, or Count One separately, that equate to an appropriate sentence.

And the [c]ourt will proceed with imposing sentence, as to Count One, the greater felony offense.

In an order denying the defendant's motion for judgment of acquittal or, in the alternative, for new trial, the court noted that the law surrounding resolution of this issue "is at best unclear." However, the court found it was "clear" that the state did have the right to present all counts to the jury. Noting the state's right to pursue all counts, the court merged the solicitation counts into the conspiracy counts for punishment and sentencing.

We reiterate that a trial court must fully instruct the jury on the general principles of law that are relevant to the issues raised by the evidence. *See Burns,* 6 S.W.3d at 464; *Harbison,* 704 S.W.2d at 319; *Elder,* 982 S.W.2d at 876. A "clear and distinct exposition of the law" is necessary to satisfy the defendant's constitutional right to a trial by jury. *Phipps,* 883 S.W.2d at 150 (quoting *McAfee,* 737 S.W.2d 304). "[T]he court must instruct the jury on those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." *Elder,* 982 S.W.2d at 876. The trial court is obligated to "reasonably assist and instruct the jury so as to avoid a miscarriage of justice." *Id.* at 878 n. 7.

Here, the trial judge's instruction that the jury could have found the defendant guilty or not guilty of any or all of the offenses charged was proper. The trial judge was required to charge the jury, so that each issue of fact raised by the evidence would be submitted to the jury on proper instructions. *Garrison,* 40 S.W.3d at 432. Although this court concluded in *Breeden* that the court's instruction that the defendant could not be found guilty of both conspiracy and attempted murder was proper, there is no precedent that says that such an instruction is mandatory. Tennessee Code Annotated section § 39-12-106(a) precludes conviction of more than one inchoate offense; however, it does not prohibit the jury's consideration of the separate offenses. In our view, the trial court did not have a duty to instruct the jury that they could not convict the defendant of both conspiracy and solicitation. The court trial court fully instructed the jury on the general principles of law that were relevant to the issues raised by the evidence. In addition, there is nothing in the record that indicates that the jury misunderstood the instructions or was misled by them. Therefore, we conclude that the trial court did not commit an error in denying the defense's request that the court instruct the jury that they may not convict the defendant of more than one of the offenses of solicitation or conspiracy. The defendant is without relief as to this issue.

### 8. Excessive Sentence

The defendant asserts that his sentence is excessive. Specifically, the defendant argues that the trial court failed to consider, as a mitigating factor, that the conspiracy for which the trial court sentenced the defendant posed no risk of harm to anyone because of Mr. Farris's feigned agreement. The defendant contends that the defendant's twenty-four-year sentence "for a jail inmate's talking trash with another inmate is excessive and disproportionate."

When an accused challenges the length and manner of service of a sentence, this court conducts a *de novo* review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401. This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus,* 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely *de novo* without the presumption of correctness. *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with our sentencing statutes, and (2) the trial court's findings are adequately supported by the record. *See State v. Arnett,* 49 S.W.3d 250, 257 (Tenn. 2001); *see also* Tenn. Code Ann. § 40-35-210(f).

The mechanics of arriving at an appropriate sentence are spelled out in the Criminal Sentencing Reform Act of 1989 and its amendments. The trial court is free to select any sentence within the applicable range if the length of the sentence complies with the purposes and principles of the Sentencing Act. Tenn. Code Ann. § 40-35-210; *see also State v. Carter,* 254 S.W.3d 335, 343 (Tenn. 2008) (noting that such principles encompass themes of punishment fitting the crime, deterrence, and rehabilitation). However, the trial court is required to place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." Tenn. Code Ann. § 40-35-210(e). Once applied, the chosen enhancement factor becomes a sentencing consideration subject to review under Tennessee Code Annotated section 40-35-401(c)(2). Thus, while the court can weigh enhancement factors as it chooses, the court may only apply the factors if they are "appropriate for the offense" and "not already an essential element of the offense." *Id*. § 40-35-114.

The defendant was convicted of conspiracy to commit first degree murder, a Class A felony. At the sentencing hearing, the court sentenced the defendant as a Range I Standard Offender, which subjected him to a sentence of fifteen to twenty-five years. The trial court found the following enhancement factors applicable: the defendant had a previous history of criminal behavior, the defendant was a leader in the commission of an offense involving two or more criminal actors, the offense involved more than one victim, and the defendant was incarcerated at the time of the offense. *See* Tenn. Code Ann. § 40-35-114(1), (2), (3), (13)(I). The court gave great weight to the defendant's previous history of criminal behavior and the defendant's classification of being incarcerated on a felony charge and awaiting trial on a murder charge. The defendant presented several mitigating factors, including that the defendant's conduct neither caused nor threatened serious bodily injury, the defendant acted under strong provocation, the defendant played a minor role in the commission of the offense, the defendant's work history, and the defendant's education. After considering the sentencing factors applicable to another charge and consecutive sentencing, the court sentenced the defendant to twenty-four years in the Tennessee Department of Correction at thirty percent.

As to the defendant's claim that the trial court did not consider that the agreement was illusory, we note that the record shows that the court did make such a consideration. When sentencing the defendant, the trial court found that the defendant's conduct did cause or threaten serious bodily injury to the Levines and noted that "regardless of what's in Mr. Farris' mind, the important factor to the [c]ourt is what was in the [d]efendant's mind." The court found that although Mr. Farris pretended that he was going to kill the Levines, both the defendant and Colonel March intended for Mr. Farris to kill the Levines and believed that Mr. Farris would kill them. It was the court's view that the evidence showed that the

plan was not imaginary in the defendant's mind and therefore, this mitigating factor was not applicable.

The record supports the trial court's findings of fact, and the defendant's sentence was within the appropriate range designated by the sentencing guidelines. Therefore, we conclude that the defendant's sentence was not excessive or contrary to our sentencing laws. The defendant is without relief as to this issue.

### 9. Consecutive Sentencing

The defendant argues that the trial court erred when it ordered that the defendant serve his sentences consecutively. The defendant contends that the Sixth Amendment to the United States Constitution requires that facts, other than prior convictions, necessary for imposing consecutive sentences must be found by the jury or admitted by the defendant.

At the time the defendant submitted his brief, the United States Supreme Court had granted certiorari on this issue. *See Oregon v. Ice,* 128 S. Ct. 1657, 170 L. Ed. 2d 353 (2008). Since then, the Supreme Court decided the case and held that the Sixth Amendment does not prohibit judges from finding facts necessary to impose consecutive, rather than concurrent, sentences for multiple offenses. *See Oregon v. Ice,* 129 S. Ct. 711 (2009). The Tennessee Supreme Court has also ruled that judicial fact finding for the purpose of imposing consecutive sentencing is not contrary to the Sixth Amendment. *See State v. Allen,* 259 S.W.3d 671, 689-90 (Tenn. 2008). Accordingly, we find that the defendant's claim is without merit, and the defendant is not entitled to relief on this issue.

### 10. Cumulative Effect of Trial Errors

The defendant claims that he is entitled to reversal of his convictions based on the cumulative errors committed during his trial. The defendant claims that the effect of the errors rendered the verdict of the trial fundamentally unfair and violated his due process guarantees. However, we find no merit to this claim in light of our previous determinations.

**Conclusion**

Based upon the foregoing, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
June 9, 2009 Session

## STATE OF TENNESSEE v. PERRY AVRM MARCH

**Criminal Court for Davidson County**
**No. 2005-D-2854 Steve Dozier, Judge**

---

**No. M2007-00707-CCA-R3-CD**

---

## JUDGMENT

Came the defendant, Perry Avram March, by counsel, and the State, by the Attorney General, and this case was heard on the record on appeal from the Criminal Court of Davidson County; and upon consideration thereof, this court is of the opinion there is no error in the judgment of the trial court.

It is, therefore, ordered and adjudged by this court that the judgment of the trial court is AFFIRMED, and the case is remanded to the Criminal Court of Davidson County for execution of the judgment and for collection of costs accrued below.

It appearing that the defendant is indigent, the costs of the appeal are taxed to the State of Tennessee.

J.C. MCLIN, Judge
THOMAS T. WOODALL, Judge
ROBERT W. WEDEMEYER, Judge