IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

January 14, 2025 Session

## STATE OF TENNESSEE v. MITCHELL HOPKINS

**Appeal from the Criminal Court for Shelby County**
**Nos. C2100646; 2100250   James Jones, Jr., Judge**

_____

### No. W2024-00173-CCA-R3-CD
_____

A Shelby County jury convicted Defendant, Mitchell Hopkins, of attempted first degree murder, aggravated assault while acting in concert with two or more people, reckless endangerment by discharging a firearm into an occupied habitation, and the employment of a firearm during the commission of a dangerous felony.  The trial court imposed an effective twenty-one-year sentence.  On appeal, Defendant contends that (1) the evidence is insufficient to support his convictions; (2) the trial court erred in denying his motions for a severance and for a mistrial and in admitting statements from a non-testifying co-defendant; and (3) the trial court erred in admitting a video compilation.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which J. ROSS DYER and JOHN W. CAMPBELL, SR., JJ., joined.

Josie S. Holland (on appeal) and Joseph McClusky (at trial), Memphis, Tennessee, for the appellant, Mitchell Hopkins.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Forrest Edwards and Chris Lareau, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Facts and Procedural History

During two separate incidents on June 8, 2020, multiple shooters fired at Leslie Kendrix's home in Shelby County, Tennessee, while numerous people were inside and

outside of the home. Lakendrick Steward sustained gunshot wounds during the first shooting. Lola Bolden, Jessie Murrell, and a two-year-old child sustained gunshot wounds during the second shooting.

As a result of the first shooting, Defendant and co-defendants Jerrell Anderson and Jaylon Hatch were charged with attempted first degree murder, aggravated assault while acting in concert with two or more persons, reckless endangerment by discharging a firearm into an occupied habitation, and the employment of a firearm during the commission of a dangerous felony. As a result of the second shooting, Defendant and co-defendants Hatch, Jerrell,[1] and Jerrell's brother, Jerry Anderson, were charged with three counts of attempted first degree murder, aggravated assault while acting in concert with two or more persons, reckless endangerment by discharging a firearm into an occupied habitation, and the employment of a firearm during the commission of a dangerous felony. Defendant and co-defendants Jerrell and Hatch proceeded to trial in October 2023, and co-defendant Jerry testified as a witness for the State.

According to the evidence presented at trial, the first shooting occurred shortly after 3:00 p.m. on June 8, 2020. Leslie Kendrix; her mother, Lola Bolden; Ms. Kendrix's daughter, Alexis Monger; and numerous other adults and children were inside the home at the time of the shooting. Those outside the home included Lakendrick Steward; Ms. Kendrix's former husband, David Freeman; and friends of Ms. Kendrix's son.

Ms. Kendrix testified that she was in her bedroom when she heard numerous shots being fired. She yelled for everyone to get down on the floor, and she remained lying on the floor until the gunfire stopped. She then got up and checked if anyone was injured. She estimated that approximately ten bullets were fired into her home during the first shooting. Ms. Monger testified that she and her two-year-old daughter were in the back room sleeping when Ms. Monger awoke to the sound of gunshots. No bullets entered the room where they were hiding.

Ms. Bolden testified that she and her three-year-old grandson were sitting at a table in Ms. Kendrix's kitchen when the first shooting occurred. She heard a noise, and Ms. Kendrix yelled that someone was shooting and to get on the floor. Once the shooting stopped, Ms. Bolden observed evidence that the bullets had entered the same room in which she had been hiding. She noted that the glass in the door was broken, that the "picture window" was cracked, and that bullet holes were in pictures that were hanging on the walls. She also observed bullets holes in the windows and television in the "front room" and in the outer brick in the front of the house.

---

[1] Because co-defendants Jerrell Anderson and Jerry Anderson share the same surname, for clarity, we will refer to them by their first names. No disrespect is intended.

Mr. Freeman testified that prior to the first shooting, he was underneath his black Infiniti working on the vehicle; his son and his son's friends were next to the vehicle; and Lakendrick Steward was in the front yard. Mr. Freeman stated that a silver Mercedes car and a black Mercedes G-Wagon pulled up in front of the house and that those inside the vehicles began shooting. Mr. Freeman could not see the shooters, but he believed two people were in each vehicle. Bullets struck Mr. Freeman's vehicle while he was near the vehicle. He said he was afraid, and he ran toward the back of the house. After the shooting, he returned to the front of the house and saw that Mr. Steward had been shot in the back. Mr. Steward was subsequently transported to a hospital.

Officer Jhukuruin Cole of the Memphis Police Department ("MPD") testified that he received a call regarding the shooting at approximately 3:25 p.m. and responded to the scene. He and crime scene officers spent approximately two and one-half hours at the scene. MPD crime scene Officer Henry Hearns collected a total of thirty-seven shell casings from the scene, including nine unknown rifle casings, three 9-millimeter casings, seven .223-caliber casings, and eighteen 5.56-millimeter casings. He testified that the evidence indicated that four different types of firearms were fired in front of the house. Officer Hearns observed possible bullet defects in Ms. Kendrix's house, in two vehicles that were outside her house, and in the neighbor's house.

The police officers left Ms. Kendrix's house at approximately 5:50 p.m., and the second shooting occurred sometime after 6:00 p.m. Jessie Murrell, a relative of Ms. Kendrix, came to her home once he learned about the first shooting, and he was armed with a firearm, which he was licensed to carry. Prior to the second shooting, Mr. Murrell, Mr. Freeman, and several others also were outside helping clean up the remnants from the first shooting; Ms. Kendrix and Ms. Monger were inside the house; Ms. Bolden was on the front porch sweeping up broken glass; and Ms. Monger's two-year-old daughter was on the porch with Ms. Bolden.

Mr. Murrell testified that he was aware that a silver Mercedes car and a black Mercedes G-Wagon were involved in the first shooting and that while he was cleaning up glass, he saw a silver Mercedes coming down the street. Mr. Murrell grabbed his gun from his vehicle and continued helping family members clean. He stated that as he was helping his aunt load chairs into her vehicle, he saw approximately five people shooting at them while standing at the street corner. Mr. Murrell returned gunfire, but he did not have a clear view of the shooters to enable him to identify them.

Mr. Murrell sustained two gunshot wounds to his leg. He went to a hospital following the shooting, but the doctors were unable to remove the bullets from his leg. At

trial, he continued to experience pain in his leg, and he had scarring because of his wounds. Bullets also struck his vehicle, and his vehicle was rendered inoperable due to the damage.

Ms. Monger's two-year-old daughter and Ms. Bolden also were shot while on the front porch. Ms. Bolden sustained a gunshot wound to her leg, and the bullet fractured her femur and exited on the other side of her leg. She was hospitalized for several days during which surgery was performed to insert a rod into her leg and to repair damage to her veins. At the time of trial, she had scarring from the gunshot wound, and she had to use a cane to walk. Ms. Monger's daughter sustained a gunshot wound to her left leg and a graze wound to her right leg. Ms. Monger drove her daughter to LeBonheur Children's Hospital before police arrived, and her daughter underwent multiple surgeries. She still needed one additional surgery at the time of trial.

Officer Cole returned to the scene following the second shooting and rendered aid to Ms. Bolden and Mr. Murrell. Officer Hearns also returned to the scene and collected a total of ninety-two spent shell casings, including thirty-four rifle casings of an unknown caliber, eleven .223-millimeter casings, nine 40-caliber casings, and thirty-eight 9-millimeter casings. Officer Hearns noted that the shell casings were recovered from four different areas. Two vehicles parked in front of Ms. Kendrix's home and two vehicles parked in a neighbor's driveway were struck by bullets.

MPD Sergeant Keith Phillips was assigned to investigate the shootings. He obtained video recordings of both shootings taken from Ms. Kendrix's Ring video doorbell camera that was positioned outside her front door. He also obtained video surveillance recordings from a nearby market and from Cherry Creek Apartments. He developed co-defendants Jerrell and Jerry as suspects.

On September 9, 2020, Sergeant Phillips interviewed co-defendant Jerrell at the police station after co-defendant Jerrell waived his rights. Sergeant Phillips recorded the interview using his body camera, and the video recording was played for the jury at trial. During the interview, co-defendant Jerrell admitted that he was present at the first shooting, that he was armed, that he fired his firearm, and that the intended target was "Big Jook." Co-defendant Jerrell stated that he was driving a silver Mercedes car, and he identified his passenger as Darrin Wilson or "Hot Boy." Co-defendant Jerrell said he did not know the names of the shooters who were in the black Mercedes G-Wagon that was behind his car. He stated that following the first shooting, he and the other shooters went to "Dome Shot's" apartment at Cherry Creek Apartments. He acknowledged watching a video recording of he and the other shooters walking to the apartment while holding the firearms that were used in the shooting. Co-defendant Jerrell stated that he returned to the location of the shooting later the same day while driving the silver Mercedes car. He said that no one was in the car with him and that he did not fire a weapon during the second shooting. He stated

- 4 -

that co-defendant Jerry was not present for the first shooting but was present for the second shooting. Co-defendant Jerrell said that the group of shooters included three people at the first shooting and eight people at the second shooting. He stated that they left the guns at the apartment following the second shooting and that he did not know what became of them. He maintained that he did not shoot the child or the grandmother.

Sergeant Phillips arrested co-defendants Jerrell and Jerry following the interview. Sergeant Phillips also interviewed co-defendant Jerry, and Sergeant Phillips acknowledged that both co-defendants Jerrell and Jerry were untruthful during their interviews. On October 6, 2020, Sergeant Phillips and a prosecutor met with co-defendant Jerry and his attorney. Co-defendant Jerry testified that he provided truthful information during the October 2020 interview and that he met with the prosecutor on two subsequent occasions during which he provided information that was consistent with his statements during the October 2020 interview. Co-defendant Jerry stated that he was not present for the first shooting and that he was charged with multiple offenses related to the second shooting. He also acknowledged that although the State had not made any promises to him in exchange for his testimony, he was hoping for some consideration by the State.

Co-defendant Jerry and Sergeant Phillips both testified at trial regarding the video recordings of the shootings and the surveillance footage. Surveillance video from a market near Ms. Kendrix's home showed a silver Mercedes car and a black Mercedes G-Wagon turn onto a nearby street shortly before the first shooting.[2] The recording from Ms. Kendrix's Ring camera showed that at 15:08 or 3:08 p.m., the silver Mercedes car and the black Mercedes G-Wagon stopped in front Ms. Kendrix's house. The driver of the car, later identified as co-defendant Jerry, stepped out of the driver's side of the car, while the passenger and the occupants of the G-Wagon rolled down the windows. They yelled at those standing outside the house. Co-defendant Jerry, his passenger, and the occupants of the G-Wagon then fired their guns numerous times before driving away from the scene.

Co-defendant Jerry testified that on the afternoon of June 8, 2020, co-defendant Jerrell called him and stated, "We just got into a shootout. We just slid on somebody." Co-defendant Jerry explained that "slid" means "do a drive-by." Co-defendant Jerrell told co-defendant Jerry to meet him at the Cherry Creek Apartments, and at that time, co-defendant Jerrell did not mention returning to the scene of the shooting. Surveillance footage from Cherry Creek Apartments showed a silver Mercedes car, a black Mercedes G-Wagon, and a black Mercedes car entering the parking lot after the first shooting.[3] Co-

---

[2] The recording lists the time as 2:45 p.m., but the parties stipulated at trial that the time listed in the record was approximately twenty-five minutes slow.

[3] The time stamp on the recording as 14:46 or 2:46 p.m., but Sergeant Phillips testified that the time stamps listed in surveillance footage from the apartment complex were incorrect.

defendant Jerry testified that he was driving the black Mercedes car and that co-defendant Jerrell was driving the silver Mercedes car. The recording showed five men exiting the vehicles and walking through the parking lot and toward the apartment complex.

Surveillance footage from a camera located near the main entryway of the apartment complex showed close-up depictions of the men as they walked by the camera. At trial, co-defendant Jerry identified a man wearing a black t-shirt with white writing on the sleeves and blue jeans as co-defendant Jerrell; a man wearing a white tank top as Defendant; a man wearing a teal shirt and carrying two large firearms as Darrin Wilson; a man smiling, wearing a white hat, and holding a large firearm as co-defendant Hatch; and the last man as himself. The trial court granted the State's request to have Defendant and the co-defendants stand before the jury in the same relative positions in which the men in the recording appeared.

Co-defendant Jerry testified that he had known Defendant for several months prior to the shootings and that Defendant was a recording artist with co-defendant Jerry's record label. Co-defendant Jerry identified a photograph of Defendant standing next to co-defendant's black Mercedes car that was taken a few months prior to the shooting. Co-defendant Jerry stated that he first met co-defendant Hatch on the day of the shootings, and he identified a photograph of co-defendant Hatch from his Facebook page. Co-defendant Jerry met Mr. Wilson on one or two occasions prior to the shootings and stated that Mr. Wilson was killed approximately one month after the shootings.

At trial, Sergeant Phillips viewed the same surveillance footage from the apartment complex and noted that the firearm that the man who co-defendant Jerry identified as co-defendant Hatch was carrying appeared to be an assault rifle. Sergeant Phillips testified that an item sticking out of the pants pocket of the man who co-defendant Jerry identified as Defendant was consistent with an extended magazine from a firearm. Sergeant Phillips acknowledged that he was not absolutely certain that the item in the man's pocket was a firearm. After meeting with co-defendant Jerry in October 2020, Sergeant Phillips identified Defendant and co-defendant Hatch as suspects. Sergeant Phillips compared photographs of Defendant and co-defendant Hatch in the MPD database to the surveillance footage and concluded that they were involved in the offenses.

Surveillance footage from the courtyard of the apartment complex showed the same five men entering an apartment. Co-defendant Jerry testified that "Dome Shot" lived at the apartment, and Sergeant Phillips confirmed that it was "Dome Shot's" girlfriend who lived at the apartment. Co-defendant Jerry stated that four or five people were inside the apartment when he and the other four men arrived. Co-defendant Jerrell told co-defendant Jerry "how they went to the . . . house and did the shooting and how he felt that they needed to go back." Co-defendant Jerry did not recall any statements made

by Defendant while inside the apartment. Co-defendant Jerry testified that co-defendant Hatch told him that his gun jammed during the first shooting and that once co-defendant Hatch repaired his gun while inside the apartment, he said, "B***h, I'm ready to go." Co-defendant Jerry stated that those at the apartment repaired any issues with their firearms from the first shooting and were "just pretty much shooting the breeze. Smoking, just chilling until they made a decision to go back."

Co-defendant Jerry testified that co-defendant Jerrell did not state why he believed they needed to return to the scene of the shooting. Co-defendant Jerry stated that no one mentioned returning to the scene to kill someone. He acknowledged that the shooting was due to drug-related debt that someone owed to co-defendant Jerrell and that the purpose of the shooting was to "send a message." Co-defendant Jerry stated that he agreed to go to the scene with co-defendant Jerrell to protect him in the event of an "ambush."

According to surveillance footage from the apartment complex, approximately thirty-four minutes after arriving, the same five men, along with three additional men, left the apartment and walked to the parking lot. As noted by Sergeant Phillips, the surveillance footage showed the eight men entering four vehicles: two silver Mercedes cars, a black Mercedes car, and a black Mercedes G-Wagon. Due to the distance of the vehicles in the parking lot from the video camera, the recording did not clearly depict who entered which vehicle. All four vehicles then exited the parking lot.

Co-defendant Jerry testified that not everyone in the group who left the apartment returned to the scene of the shooting. He stated that two of the four vehicles went to the scene, which included a silver Mercedes car that he was driving and a black Mercedes car driven by co-defendant Jerrell. Co-defendant Jerry testified that Mr. Wilson was in the car with him and that he believed Defendant and co-defendant Hatch were in the car with co-defendant Jerrell. They drove around the area, and co-defendant Jerry saw a few men with guns standing in front of the house. Co-defendant Jerry stated that he and co-defendant Jerrell parked their cars at a corner near an intersection where co-defendant Jerry and others with him began firing their guns toward the house. Co-defendant Jerry said that he had either a 9-millimeter or 40-caliber firearm, that co-defendant Jerrell had a "tech nine" that shot 9-millimeter shells, and that Defendant and co-defendant Hatch both had assault rifles. Co-defendant Jerry acknowledged that no one shot at him before he began shooting. He stated that he did not see co-defendant Jerrell shooting his firearm during the second shooting. Co-defendant Jerry said that he, Mr. Wilson, and Defendant were firing their guns and that co-defendant Hatch crossed the street and began firing his gun while standing at the opposite corner. Co-defendant Jerry testified that following the second shooting, he, co-defendant Jerrell, Mr. Wilson, Defendant, and co-defendant Hatch returned to the Cherry Creek Apartments.

Sergeant Phillips testified that through his investigation, he determined that the black Mercedes car and the silver Mercedes car circled the block near the house prior to the second shooting. Surveillance video from a nearby market showed the two cars turning down a road near the house, a partial view of one of the cars as it stopped on the roadway, and the shoes of those exiting the vehicle. The recording of the second shooting from Ms. Kendrix's Ring camera showed what appeared to be three people standing at a corner down the road from the house and shooting firearms toward the house before fleeing. A man standing in the driveway returned fired while others outside the home were screaming and crying. Surveillance footage from the nearby market then showed the silver Mercedes car and the black Mercedes car leaving the area.

Co-defendant Jerry testified that the Ring camera recording showed him and Mr. Wilson shooting and that the third shooter depicted in the recording was either co-defendant Jerrell or Defendant. Co-defendant Jerry stated that the recording did not show co-defendant Hatch as he was crossing the street to the opposite corner or as he was shooting. Sergeant Phillips testified that he was unable to determine who was at the second shooting based on the Ring camera recording but that based on information that he received from co-defendants Jerry and Jerrell, both co-defendants Jerry and Jerrell, as well as Mr. Wilson, were present for the second shooting. Sergeant Phillips stated that none of the vehicles returned to the apartment complex following the second shooting.

Co-defendant Jerry testified that co-defendant Jerrell expressed remorse since the shooting and told co-defendant Jerry that he did not go to the house for the purpose of engaging in a shooting. Co-defendant Jerry acknowledged that co-defendant Jerrell called him from the jail following jury selection. The recording of the call, which was redacted to remove statements implicating Defendant and co-defendant Hatch, was entered as an exhibit and played for the jury. Co-defendant Jerry stated that during the call, he attempted to "downplay the situation because I know what I actually have to do today." He acknowledged that co-defendant Jerrell told him to "[j]ust say it was about some money" and that co-defendant Jerrell did not want co-defendant Jerry testifying about the reason for the shooting. Co-defendant Jerry acknowledged that when co-defendant Jerrell stated that "it really a lot more heard on that gun. Yeah, the gun that I said I shot," he meant that more people were shot during the second shooting. Although co-defendant Jerrell stated that "it's like us against them. So, as long as you just go against them, you straight," co-defendant Jerry denied that they had a plan whereby he would attempt to minimize co-defendant Jerrell's actions. Co-defendant Jerry acknowledged that co-defendant Jerrell said he planned to plead guilty to reckless endangerment to see whether the jury would "bite on that junt."

The State questioned co-defendant Jerry about the following statement during the recorded call with co-defendant Jerrell from the jail, "they supposed to be starting shooting

first. So, he, you know, he told them to come over there. So, like whatever he supposed to do." Co-defendant Jerry replied, "Blue, when he called—Mitchell, when he called back—," and Defendant objected. Defendant moved for a mistrial, arguing that although the statement in the recording referred to the third person as "he," the State elicited testimony from co-defendant Jerry identifying "he" as "Blue," in violation of *Bruton v. United States*, 391 U.S. 123, 126 (1968), and the trial court's prior rulings regarding the redacting of the recorded call to remove references to Defendant. Defendant stated that even if co-defendant Jerry's testimony did not identify "Blue" as Defendant, the jury would learn that his nickname is "Blue" as part of his defense at trial and, thus, connect Defendant to the statements made during the jail call. Following a hearing outside the jury's presence, the trial court denied Defendant's motion for a mistrial and issued a curative instruction for the jury to disregard co-defendant Jerry's remark.

Co-defendant Jerry testified that approximately one week after the shootings, he saw Defendant, who was upset and crying. Co-defendant Jerry stated that Defendant was upset that a child was injured and that he wanted to turn himself in to the police. On cross-examination by Defendant's counsel, co-defendant Jerry acknowledged that in February 2021, he released a "remix" where he mentioned harming "Blue," which was Defendant's nickname.

Rebecca Gross, a technical litigation analyst with the Shelby County District Attorney General's Office, testified that she created a video montage whereby she placed the video recordings that had been previously entered as exhibits at trial in chronological order and added an overlay of a map showing the shooters' possible route to and from the scene of the shootings. She acknowledged that there were other routes that the shooters could have taken to and from the scene. She also made a still frame of the men in the surveillance footage from the apartment complex who co-defendant Jerry identified as Defendant and co-defendant Hatch. She zoomed in on each frame and added photographs of Defendant and co-defendant Hatch as overlays next to each frame to allow the jury to compare the photographs with the men depicted in the surveillance video.

Defendant and the co-defendants Jerrell and Hatch chose not to testify in their defense and presented no other proof. The jury convicted co-defendant Jerrell of all charges based on his role in both shootings. The jury acquitted Defendant and co-defendant Hatch of the charges related to the second shooting and convicted them of attempted first degree murder, aggravated assault while acting in concert with two or more people, reckless endangerment by discharging a firearm into an occupied habitation, and the

- 9 -

employment of a firearm during the commission of a dangerous felony based on their roles during the first shooting.[4]

Following a sentencing hearing, the trial court sentenced Defendant to an effective twenty-one-year term of confinement. Defendant filed a timely motion for new trial, which the trial court denied following a hearing. He then filed a timely notice of appeal.

## II. Analysis

On appeal, Defendant contends that (1) the evidence is insufficient to support his convictions; (2) the trial court erred in denying his motions for a severance and for a mistrial and in admitting statements from a non-testifying co-defendant; and (3) the trial court erred in admitting a video compilation of other exhibits introduced at trial.

### A. Sufficiency of the Evidence

Defendant contends that the evidence is insufficient to establish his identity as a perpetrator in the first shooting. He argues that the State failed to sufficiently corroborate co-defendant Jerry's identification testimony. The State responds that the evidence is sufficient to corroborate Defendant's identification and participation in the first shooting. We agree with the State.

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see also State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011); Tenn. R. App. P. 13(c). "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal; therefore, the burden is shifted to the defendant to prove why the evidence is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which

---

[4] This court affirmed the convictions of co-defendants Jerrell and Hatch on direct appeal. *See State v. Hatch*, No. W2023-01764-CCA-R3-CD, 2024 WL 4948828, at *1 (Tenn. Crim. App. Dec. 3, 2024); *State v. Anderson*, No. W2023-01618-CCA-R3-CD, 2024 WL 4765856, at *1 (Tenn. Crim. App. Nov. 13, 2024), *no perm. app. filed*.

may be drawn therefrom." *Id.* at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Therefore, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

Regarding Defendant's conviction for attempted first degree murder, Tennessee Code Annotated section 39-13-202(a)(1) (2018) provides that first degree murder is the "premeditated and intentional killing of another." As the trial court instructed the jury, a person commits criminal attempt who, "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2).

As applicable to the instant case, a person commits aggravated assault who intentionally or knowingly "causes another to reasonably fear imminent bodily injury[,]" and such acts "[i]nvolved the use or display of a deadly weapon." Tenn. Code Ann. §§ 39-13-101(a)(2) (2018); 39-13-102(a)(1)(A)(iii) (Supp. 2019). Aggravated assault is a Class C felony, but the offense is a Class B felony if committed while acting in concert with two or more persons. Tenn. Code Ann. §§ 39-12-302(a); 39-13-102(c)(1)(A)(ii) (Supp. 2019). "This Court has likened 'acting in concert' with criminal responsibility in the context of a case involving the commission of a robbery." *State v. Rivers*, No. W2018-00861-CCA-R3-CD, 2019 WL 3776026, at *5 (Tenn. Crim. App. Aug. 9, 2019) (citing *State v. Spencer*, No. M2016-01219-CCA-R3-CD, 2017 WL 2800147, at *6 (Tenn. Crim. App. June 18, 2017)).

Regarding Defendant's conviction for reckless endangerment, Tennessee Code Annotated section 39-13-103(a) (Supp. 2019) provides that "[a] person commits an offense who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." Reckless endangerment by discharging a firearm into an occupied habitation is a Class C felony. Tenn. Code Ann. § 39-13-103(b)(3) (Supp. 2019). The trial court also instructed the jury on criminal responsibility for the conduct of another with respect to the charges of attempted first degree murder, aggravated assault, and reckless endangerment. As the court instructed the jury, a person is criminally responsible for an offense committed by another if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense". Tenn. Code Ann. § 39-11-402(2). Finally, it is an offense to employ a firearm during the

commission of or attempt to commit a dangerous felony. Tenn. Code Ann. § 39-17-1324(b)(1), (2) (Supp. 2019). The State relied on the charge of attempted first degree murder as the predicate dangerous felony. *See* Tenn. Code Ann. § 39-17-1324(i)(1)(A) (Supp. 2019).

Defendant does not challenge the sufficiency of the evidence as it relates to the specific elements of the offenses for which he was convicted. Rather, he asserts that the State failed to sufficiently corroborate co-defendant Jerry's testimony regarding Defendant's identity as a perpetrator.

Identity is an essential element of every crime. *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015). The identification of the perpetrator of a crime is a question of fact for the jury. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005), *abrogated on other grounds by State v. Miller*, 638 S.W.3d 136, 150 (Tenn. 2021). In resolving questions of fact, such as the identity of the perpetrator, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting *State v. Hornsby*, 858 S.W.2d 892, 897 (Tenn. 1993)). Circumstantial evidence may establish identity. *Bell*, 512 S.W.3d at 198-99 (concluding circumstantial evidence that the defendant was the perpetrator was sufficient to uphold the verdict).

Under Tennessee law as it stood when the trial in this case commenced,[5] when the conviction is "'solely based upon the uncorroborated testimony of one or more accomplices,'" the evidence is insufficient to sustain a conviction as a matter of law. *State v. Thomas*, 687 S.W.3d 223, 239 (Tenn. 2024) (quoting *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013)). The Tennessee Supreme Court has defined "'accomplice' to mean 'one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime.'" *Id.* (quoting *Collier*, 411 S.W.3d at 894). Further, "accomplices cannot corroborate each other." *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. 2001) (citing *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995)). "The test for whether a witness qualifies as an accomplice is whether the alleged accomplice could be indicted for the same offense charged against the defendant." *Jones*, 568 S.W.3d at 133 (internal quotation marks omitted) (quoting *Collier*, 411 S.W.3d at 894).

Separately, the Tennessee Supreme Court has explained the nature of required corroboration evidence:

_____

[5] On March 7, 2024, the Tennessee Supreme Court abolished the accomplice-corroboration rule. *Thomas*, 687 S.W.3d at 242-43. However, the court chose to do so prospectively in the interest of fairness and due process. *Id.* at 245. The court specifically declined to apply its ruling to the defendant's case and to "other pending cases that have not yet reached final judgment." *Id.* Accordingly, we apply the common law accomplice-corroboration rule as it stood before the Tennessee Supreme Court's opinion in *Thomas*.

[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (alteration in original) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994), *superseded by statute on other grounds*, Tenn. Code Ann. § 39-13-204(i)(2), as recognized in *State v. Odom*, 137 S.W.3d 572, 580-81 (Tenn. 2004)).

The evidence, when viewed in the light most favorable to the State, established that the occupants of a black Mercedes G-Wagon and a silver Mercedes car driven by co-defendant Jerrell stopped in front of Ms. Kendrix's house and that the occupants of the vehicles fired numerous shots before driving away from the scene. Based on the calibers of shell casings that officers recovered from the scene, at least four different types of firearms were used during the shooting. Co-defendant Jerry testified that although he was not present for the first shooting, he met the other men in the parking lot of Cherry Creek Apartments after the shooting and walked with them to the apartment. Surveillance footage from the apartment complex showed co-defendant Jerrell's silver Mercedes car, a black Mercedes G-Wagon, and co-defendant Jerry's black Mercedes car entering the parking lot of the complex after the first shooting. The surveillance footage showed five men, some of whom were holding firearms, exiting the vehicles, walking past a camera near the main entranceway, and into an apartment. This group of men included co-defendant Jerrell, who admitted to the police that he was present during the first shooting and was one of the shooters, and prior to the presentation of the proof at trial, co-defendant Jerrell pleaded guilty to the reckless endangerment charge that arose from the first shooting. Co-defendant Jerry identified Defendant in the surveillance video from the apartment complex as the man wearing a white tank top and stated that Defendant was in the apartment while others were discussing returning to Ms. Kendrix's house.

The jury had the opportunity to compare Defendant's appearance at trial and a photograph of Defendant that was entered as an exhibit at trial with the surveillance footage from the apartment complex. Sergeant Phillips corroborated Defendant's identity by comparing his photograph from the MPD database with the surveillance footage of the

shooters returning to the apartment complex following the first shooting. Sergeant Phillips noted that in the surveillance footage, Defendant had what appeared to be a firearm in his pocket.

We note that "[o]nly slight circumstances are required to corroborate an accomplice's testimony." *State v. Fusco*, 404 S.W.3d 504, 524 (Tenn. Crim. App. 2012) (citation omitted). This court recently held that similar evidence was sufficient to corroborate co-defendant Jerry's identification of co-defendant Hatch as a participant in the offenses. *See State v. Hatch*, No. W2023-01764-CCA-R3-CD, 2024 WL 4948828, at *6-7 (Tenn. Crim. App. Dec. 3, 2024); *see also State v. Fuller*, No. M2023-00694-CCA-R3-CD, 2024 WL 4235619, at *7 (Tenn. Crim. App. Sept. 19, 2024) (holding that the officers' identification of the defendant from a video recording was sufficient to corroborate the accomplices' identification of the defendant), *perm. app. filed* (Tenn. Nov. 18, 2024). We likewise conclude that the evidence is sufficient to corroborate co-defendant Jerry's identification of Defendant.

The evidence, when viewed in the light most favorable to the State, established that shortly after the first shooting, Defendant arrived at an apartment complex with multiple men, one of whom admitted to being a shooter, in the same vehicles in which the shooters had fled; that many of the men were carrying firearms; that Defendant likewise appeared to be armed; and that while in the apartment, the men who were with Defendant discussed the shooting and their intent to return to the scene while repairing firearms that jammed during the first shooting. We conclude that this evidence is sufficient to establish Defendant's identity as a participant in the first shooting. Accordingly, Defendant is not entitled to relief on this basis.

## B. Admission of a Co-Defendant's Statements

Defendant challenges the trial court's decision to admit a redacted recording of co-defendant Jerrell's telephone calls from jail to co-defendant Jerry when co-defendant Jerrell did not testify at trial. Defendant argues that the admission of the redacted recording violated the United States Supreme Court's holding in *Bruton v. United States* that the admission of a statement at a defendant's trial by a non-testifying co-defendant which expressly incriminates the defendant violates the defendant's constitutional right of confrontation. *See Bruton v. United States*, 391 U.S. 123, 126 (1968). Defendant asserts that the trial court should have excluded the recording in its entirety or granted Defendant's motion for severance and a mistrial. Defendant also argues that co-defendant Jerry's reference to "Blue," which is Defendant's nickname, when testifying about the calls violated *Bruton* and that the trial court erred in denying Defendant's resulting motion for a mistrial.

- 14 -

The State responds that the trial court properly exercised its discretion in denying Defendant's motions for severance and a mistrial and in allowing the State to introduce the redacted recording of the telephone calls. The State further responds that the trial court properly exercised its discretion in denying Defendant's motion for a mistrial following co-defendant Jerry's comment at trial and in issuing a curative instruction. We agree with the State.

*1. Underlying Proceedings*

The record reflects that on the night after the jury was chosen and sworn but prior to the beginning of the proof, co-defendant Jerrell called co-defendant Jerry twice from the jail during which they discussed the shootings and co-defendant Jerry's upcoming testimony. During the calls, Defendant was referred to as "Blue"; co-defendant Hatch was referred to as "Hatch"; and Darrin Wilson was referred to as "Hot Boy." During a jury-out hearing the following morning, the State announced its intention to introduce the recording of the calls during co-defendant Jerry's testimony at trial. The State argued that the statements in the recording were a "tacit admission" by co-defendant Jerrell of his participation in the offenses and that "the jury ought to be able to hear that he is discussing ad nauseam his guilt in all of this." Defendant moved for a mistrial, arguing that the new evidence "substantially" affected his defense strategy. He stated that the admission of the recorded statements "about how Blue was doing this and that and set it all up" would violate *Bruton*.

The trial court found that the admission of the recorded statements referencing Defendant's actions or role in the offenses would violate *Bruton*, and the court noted that it was inclined to grant Defendant's motion for a mistrial. The State requested the opportunity to attempt to cure the *Bruton* violations by redacting the references to Defendant and co-defendant Hatch in the recording. The State argued that the admission of the redacted recording would not materially change the defense strategies of Defendant and co-defendant Hatch because the statements in the recording would not implicate them in the offenses. The court granted a recess to allow the parties to attempt to reach an agreement on the portions of the recording to redact to resolve the *Bruton* issues.

Once the jury-out hearing reconvened, the State announced that the parties had reached an agreement regarding the redaction of multiple statements in the recording. The State noted that the parties disagreed regarding the inclusion of co-defendant Jerrell's statement to co-defendant Jerry in the recording to "[j]ust say it was about the money. Don't say anything about the other s**t." The State argued that because the statement did not reference any other co-defendant, the admission of the statement did not violate *Bruton*. Defendant argued that the statement implicated him because the State was proceeding under a theory of criminal responsibility for the conduct of another. Defendant also argued

that because he would be unable to question co-defendant Jerrell if he did not testify at trial, the admission of the statement violated *Bruton*. The trial court found that co-defendant Jerrell's statement did not implicate Defendant and that the admission of the statement did not violate *Bruton*.

Defendant informed the trial court that he was not conceding the issue of the admissibility of the redacted recording. He argued that the court should grant his motion for a mistrial and sever his trial from his co-defendants' trial. Defendant argued, "If we have to go forward with the co-defendant's statement, we have edited it to the best of our ability to mitigate the damage that will be done." The trial court found that the admission of the redacted recording did not violate *Bruton* and denied Defendant's motion for severance and a mistrial.

During the State's direct examination of co-defendant Jerry at trial, the State played portions of the redacted recording after which the State questioned co-defendant Jerry about the statements. Co-defendant Jerry acknowledged that during the telephone calls, he made statements to co-defendant Jerrell in an attempt to "downplay the situation" and what his testimony would be at trial. The record reflects that "[s]econd call continued" after which the following exchange occurred:

Q. What did you mean by all that?

A. Which part?

Q. When you said they supposed to be starting shooting first. So, he, you know, he told them to come over there. So, like whatever he supposed to do.

A. Blue, when he called—Mitchell, when he called back—

Defendant objected, and during a hearing outside the jury's presence, he again moved for a mistrial. Defendant asserted that although the statement in the recording referred to the third person as "he," the State elicited testimony from co-defendant Jerry identifying "he" as "Blue," in violation of *Bruton* and the trial court's prior rulings. Defendant stated that even if co-defendant Jerry's testimony did not identify "Blue" as Defendant, the jury would learn that his nickname is "Blue" as part of his defense at trial. He maintained that the jury was aware that a shooting occurred in front of the house and at the street corner and that based on co-defendant Jerry's testimony regarding the recording, the jury heard that "[Defendant] called them and told them to come over there. That's how the case starts."

- 16 -

The State responded that in asking co-defendant Jerry "what did you mean by that," the State believed co-defendant Jerry would respond that he was telling co-defendant Jerrell that he would testify that "these guys called us over there and they start[ed] shooting first." The State argued that "when this is taken in the context of this muddled jail call, there's just not enough there for this jury to say, 'Oh, yes, he was indicating to his brother that Blue started all of this.'" The State argued that the testimony did not warrant a mistrial and that a curative instruction was warranted instead.

The trial court found that once co-defendant Jerry began testifying, Defendant quickly objected, and the State and the court stopped co-defendant Jerry from testifying. The court also found that a person who did not know the facts of the case would not have understood the information "within that sentence or partial sentence" and that Defendant's expressed concerns regarding co-defendant Jerry's testimony "is based more on [Defendant's] understanding of the totality of the facts . . . and not just on the information that had been presented." The court found that a curative instruction to the jury to disregard the statement would remove the possibility that the information tainted the jury. The court denied Defendant's motion for a mistrial and instructed the parties to exercise care in questioning witnesses to avoid opening the door to testimony that would violate the court's previous ruling. Once the trial resumed, the trial court instructed the jury to disregard the testimony and not to factor the testimony in its deliberations or consider the testimony for any other purpose.

*2. Analysis*

"The grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court," and this court will not disturb the trial court's ruling absent a clear abuse of discretion. *State v. Dotson*, 254 S.W.3d 378, 390 (Tenn. 2008) (citing *Hunter v. State*, 440 S.W.2d 1, 6 (Tenn. 1969), *vacated on other grounds by Hunter v. Tennessee*, 403 U.S. 711, 712 (1971); *State v. Burton*, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988)). A trial court abuses its discretion in denying severance if the record demonstrates "'the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty.'" *Burton*, 751 S.W.2d at 447 (quoting *Hunter*, 440 S.W.2d at 6). Likewise, "the granting of a mistrial is a matter resting within the sound discretion of the trial court and will not be reversed absent an abuse of discretion; 'normally, a mistrial should be declared only if there is a manifest necessity for such action.'" *State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009) (quoting *State v. Saylor*, 117 S.W.3d 239, 250-51 (Tenn. 2003)).

In *Bruton v. United States*, the United States Supreme Court held that admission of a statement of a non-testifying co-defendant which expressly incriminates the complaining defendant violates the complaining defendant's constitutional right of confrontation.

*Bruton*, 391 U.S. at 129; *see* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. The United States Supreme Court has distinguished cases where "the confession was not incriminating on its face and became so only when linked with evidence introduced later at trial (the defendant's own testimony)" from the situation in *Bruton* where the co-defendant's confession expressly implicated the defendant. *Richardson v. Marsh*, 481 U.S. 200, 208 (1987) (footnote omitted). The Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211. This court also has recognized that *Bruton* "does not apply to confessions which do not implicate the non-confessing defendant, nor does it apply to confessions from which all references to the moving defendant have been effectively deleted, provided that, as deleted, the confession will not prejudice the moving defendant." *Dorsey v. State*, 568 S.W.2d 639, 642 (Tenn. Crim. App. 1978) (citations omitted).

"'Tennessee Rule of Criminal Procedure 14(c)(1) addresses a *Bruton* problem.'" *Metz v. State*, No. M2019-00883-CCA-R3-PC, 2021 WL 58197, at *34 (Tenn. Crim. App. Jan. 7, 2021) (quoting *State v. Coleman*, No. W2001-01021-CCA-R3-CD, 2002 WL 31625009, at *7 (Tenn. Crim. App. Nov. 7, 2002)). Rule 14(c)(1) provides:

> If a defendant moves for a severance because an out-of-court statement of a codefendant makes reference to the defendant but is not admissible against the defendant, the court shall determine whether the state intends to offer the statement in evidence at trial. If so, the court shall require the prosecuting attorney to elect one of the following courses:
>
> (A)  a joint trial at which the statement is not admitted in evidence or at which, if admitted, the statement would not constitute error;
>
> (B)  a joint trial at which the statement is admitted in evidence only after all references to the moving defendant have been deleted and if the redacted confession will not prejudice the moving defendant; or
>
> (C)  severance of the moving defendant.

Tenn. R. Crim. P. 14(c)(1). This provision addresses "'the *Bruton* issue . . . making severance unnecessary where no *Bruton* violation would follow, as would be true, for example, where the confessing codefendant testifies or where redaction eliminates any prejudice to the nonconfessing codefendant.'" *Summers v. State*, No. W2016-02157-CCA-

R3-PC, 2017 WL 2998787, at *9 (Tenn. Crim. App. July 14, 2017) (quoting Tenn. R. Crim. P. 14, Advisory Comm'n Cmt.). Rule 14(a)(1)(A) provides that "[a] defendant's motion for severance of offenses or defendants shall be made before trial, except that a motion for severance may be made before or at the close of all evidence if based on a ground not previously known. A defendant waives severance if the motion is not timely."

Defendant contends that the admission of the redacted recording of the telephone calls violated *Bruton* and that the trial court should have granted his motions for a mistrial and severance. Because the basis upon which Defendant sought severance and a mistrial did not occur until after the jury was sworn, Defendant's motions made prior to the presentation of the evidence were timely. The trial court reviewed the recording of co-defendant Jerrell's telephone calls from the jail and granted the State the opportunity to redact any reference to Defendant. Redaction of a non-testifying co-defendant's statement has been recognized as an available option that may be used in an effort to cure a *Bruton* violation. *See Richardson*, 481 U.S. at 211; *Dorsey*, 568 S.W.2d at 642; *see also* Tenn. R. Crim. App. 14(c)(1)(A). After meeting with defense counsel, the State produced a redacted recording of the calls, which the trial court found sufficiently cured the *Bruton* violations. On appeal, Defendant does not identify any statement in the redacted recording that incriminated him on its face but relies on other evidence presented at trial to support his claim that the admission of the redacted recording violated *Bruton*. The holding in *Bruton*, however, is limited to situations in which the co-defendant's statements "'expressly implicat[ed]' the defendant as his accomplice" and does not extend to situations in which "the confession was not incriminating on its face and became so only when linked with evidence introduced later at trial." *Richardson*, 481 U.S. at 208 (quoting *Bruton*, 391 U.S. at 124 n.1); *see State v. Flynn*, 2017 WL 1861784, at *17 (Tenn. Crim. App. May 5, 2017). Defendant, therefore, has failed to establish that his confrontation rights were not violated by the trial court's admission of the redacted recording, and the trial court did not abuse its discretion in denying Defendant's motion to sever and for a mistrial.

Defendant asserts that even if the admission of the redacted recording did not violate *Bruton*, co-defendant Jerry's mentioning "Blue" and "Mitchell" in testifying regarding the meaning one of the statements made during the telephone call violated *Bruton*. Defendant maintains that as a result, the trial court erred in denying his motion for a mistrial. The State responds that the trial court did not abuse its discretion in denying Defendant's motion for a mistrial and that "the trial court properly stopped the testimony, reviewed the context of the comment, and issued a curative instruction."

"The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). "When determining whether a mistrial is necessary because inappropriate testimony was presented to the jury, this court

- 19 -

considers the following nonexclusive factors: (1) whether the state elicited the testimony; (2) whether the trial court gave a curative instruction; and (3) the relative strength or weakness of the state's proof." *State v. March*, 494 S.W.3d 52, 78 (Tenn. Crim. App. 2010) (internal quotation omitted). Furthermore, "the mere finding of a *Bruton* error in the course of [a] trial 'does not automatically require reversal of the ensuing criminal conviction.'" *King v. State*, 989 S.W.2d 319, 329 (Tenn. 1999) (quoting *Schnedble v. Florida*, 405 U.S. 427, 430 (1972)). "In cases where the properly admitted evidence of guilt is overwhelming, and the prejudicial effect of the codefendant's confession is insignificant by comparison, then the improper admission is harmless beyond a reasonable doubt." *Id.*

Defendant argues that in referring to "Blue" and "Mitchell," co-defendant Jerry "was allowed to give [co-defendant] Jerrell's testimony that [Defendant] (Blue/Mitchell) had invited them over to the apartment, implicating [Defendant] as the leader and planner of the offenses." The trial court found that once co-defendant Jerry made the reference, Defendant quickly objected, and the State and the court stopped co-defendant Jerry's testimony. The court also found that Defendant's concerns regarding the implication of the testimony were based on his understanding "of the totality of the facts" and "not just on the information that had been presented." The record supports the trial court's findings. The statement in the record about which the State questioned co-defendant Jerry was "muddled," the meaning of the statement was unclear; and co-defendant Jerry's brief reference to "Blue" and "Mitchell" did nothing to clarify the statement. The record does not reflect that the State intentionally elicited the challenged testimony. Furthermore, the court instructed the jury not to consider co-defendant Jerry's remark for any purpose, and we must presume that the jury followed the court's curative instruction. *See State v. Smith*, 893 S.W.2d 908, 923 (Tenn. 1994); *State v. Burress*, No. E2013-01697-CCA-R3-CD, 2014 WL 6855226, at *17 (Tenn. Crim. App. Dec. 4, 2014).

The evidence of Defendant's participation in the first shooting was not dependent upon co-defendant Jerry's comment, and the jury acquitted Defendant of all charges related to the second shooting. The record does not establish that co-defendant Jerry's comment contributed to the jury's verdict. Accordingly, even if the comment was improper, the error was harmless beyond a reasonable doubt, and the trial court did not err in denying Defendant's motion for a mistrial.

## C. Admission of Video Montage

Defendant challenges the trial court's admission of the video montage as an exhibit. Citing Tennessee Rules of Evidence 401 and 403, he argues that the video montage was

irrelevant and unfairly prejudicial. Defendant did not challenge the admissibility of the video montage pursuant to Rules 401 and 403 at trial or in his motion for new trial. Rather, he argued against the admissibility of the video montage at trial and his motion for new trial based on the State's late disclosure of the evidence. An appellant cannot raise an issue for the first time on appeal or change his arguments on appeal. *See Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983); *State v. Hardison*, 680 S.W.3d 282, 309 (Tenn. Crim. App. 2023); *see also* Tenn. R. App. P. 36(a). "In other words, 'a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason' on appeal." *Hardison*, 680 S.W.3d at 309 (quoting *State v. Dobbins*, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1988)). Therefore, Defendant has waived this argument on appeal. He did not request plain error review on this issue, and we decline to conduct such a review. Defendant is not entitled to relief on this issue.

## III. Conclusion

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE
